Argued and submitted October 8, affirmed December 30, 1986

# STATE OF OREGON,
*Respondent on review,*

*v.*

# GEORGE MANLEY HUNTLEY,
*Petitioner on review.*

## (CC J85-0876; CA A38016; SC S33037)

730 P2d 1234

Lawrence J. Hall, Salem, argued the cause for petitioner on review. On the petition was Gary D. Babcock, Public Defender, Salem.

Thomas H. Denney, Assistant Attorney General, Salem, argued the cause for respondent on review.

JONES, J.

## JONES, J.

Defendant, George M. Huntley, pled guilty to a charge of sodomy in the first degree, a Class A felony. ORS 163.405. The victim of the crime was defendant's 11-year-old niece. At the time of this offense, defendant was on temporary leave from the Oregon State Penitentiary where he was serving consecutive 20-year sentences stemming from his conviction in March 1978 for sodomy in the first degree and rape in the first degree. In both prior offenses defendant threatened the victims with a weapon.

After the plea to the current charge, the state requested the court to find that defendant was a dangerous offender under ORS 161.725, which provides that a court may sentence a defendant convicted of a Class A felony to imprisonment of 30 years if the court finds, among other things, that defendant is suffering from a severe personality disorder indicating a propensity toward criminal activity. Dr. Charles Holland, a psychiatrist, examined defendant in connection with the sentencing proceeding. Dr. Holland reported to the court as follows:

"I have completed a psychiatric examination of George M. Huntley pursuant to a court order signed by Circuit Court Judge, Ronald Poole. The examination was requested for the purposes of allowing me to express an opinion regarding whether or not the defendant suffers from a severe personality disorder indicating a propensity towards criminal activity.

"Mr. Huntley was examined in my office in Eugene on August 26, 1985. The examination consisted of an interview of Mr. Huntley in addition to administering a Minnesota Multiphasic Personality Inventory via computer format.

"Prior to examining him I reviewed police reports which had been generated in connection with the reference charges of Sodomy I.

"* * * * *

"In an effort to address the questions raised by the referring agency, Mr. Huntley's past personal history was carefully scrutinized in reference to the diagnostic criteria of an adult antisocial personality disorder. The diagnostic criteria in DSM III, the diagnostic and statistical manual of the American Psychiatric Association, are most explicit regarding antisocial personality disorders.

"In reference to these criteria, while Mr. Huntley does demonstrate some of the historical data outlined in the criteria, he does not completely fulfill the criteria. For this reason, I conclude he does not have an antisocial personality disorder. An antisocial personality disorder is the only disorder which I accept as indicating a propensity towards criminal activity as an integral part of the personality disorder.

"The Minnesota Multiphasic Personality Inventory returned a diagnosis of antisocial personality suggesting a rather stable character disorder with no substantial emotional distress present.

"The clinical interview of Mr. Huntley revealed him to be a soft spoken individual who manifested blunting of his affect. On many occasions his facial musculature reflected tension as well as depression when he talked about the reference incident. He seems to have some insight regarding the fact he has a problem and expresses a desire to become involved in the Oregon State Hospital treatment program for sexual offenders.

"My conclusion is, Mr. Huntley does not suffer from a severe personality disorder with a propensity towards criminal activity. While making the statement, I wish to emphasize this conclusion has no prognostic value in determining whether or not Mr. Huntley will again commit a sexual offense. I do not believe it is within the capabilities of a psychiatrist to predict dangerousness."

The trial judge held that he was not bound by Dr. Holland's diagnosis and prognosis and made his own conclusions whether this defendant was a dangerous offender under ORS 161.725. The trial judge stated that while he was required to consider the psychiatric report he was not bound by that report in reaching a conclusion whether defendant had a severe personality disorder, relying on *State v. Hunter,* 58 Or App 99, 647 P2d 943 (1982), *rev den* 294 Or 391 (1983); *State v. Sanders,* 35 Or App 503, 582 P2d 22 (1978), *rev den* 285 Or 195 (1979); and *State v. Klenk,* 19 Or App 684, 528 P2d 1092 (1974).

The trial judge then found that defendant was a dangerous offender under ORS 161.725 and sentenced him to 30 years' imprisonment with a mandatory minimum sentence of 15 years. This sentence was imposed to run consecutive to the sentences defendant was currently serving. In reaching this conclusion the trial judge considered the absolute lack of

rehabilitation demonstrated by defendant's commission of this offense, defendant's previous convictions for similar offenses, the proximity of time between defendant's release and the commission of the crime, and Dr. Holland's observations.

The Court of Appeals affirmed defendant's conviction and sentence from the bench. We allowed review to interpret the dangerous offender statutes and specifically to decide (1) whether the legislature intended that an opinion of a psychiatrist that a defendant is suffering from a "severe personality disorder indicating a propensity toward criminal activity" is essential to the sentencing of a defendant as a dangerous offender under ORS 161.725, and (2) whether a defendant can be sentenced as a dangerous offender when the only psychiatric report considered by the court pursuant to ORS 161.735(6) concludes that the defendant does not suffer from a severe personality disorder with a propensity toward criminal activity.

ORS 161.725 provides:

"The maximum term of an indeterminate sentence of imprisonment for a dangerous offender is 30 years, *if the court finds that because of the dangerousness of the defendant an extended period of confined correctional treatment or custody is required for the protection of the public and if it further finds,* as provided in ORS 161.735, that one or more of the following grounds exist:

"(1) *The defendant is being sentenced for a Class A felony, and the court finds that the defendant is suffering from a severe personality disorder indicating a propensity toward criminal activity.*

"(2) The defendant is being sentenced for a felony that seriously endangered the life or safety of another, has been previously convicted of a felony not related to the instant crime as a single criminal episode, and the court finds that the defendant is suffering from a severe personality disorder indicating a propensity toward criminal activity." (Emphasis added.)

Thus, in order for a sentencing judge to apply ORS 161.725 to a defendant, the judge must first declare that he has reason to believe that because of the dangerousness of the defendant an extended period of confinement is required for the protection of the public and make appropriate findings on

the record to justify that belief. Further, the judge must find that the defendant is being sentenced for a Class A felony or a felony that seriously endangered the life or safety of another and has been previously convicted of a felony not related to the instant crime as a single criminal episode. After making these findings, the judge must order a presentence report and psychiatric examination of the defendant. The court then must conduct a presentence hearing unless waived by the defendant. At the hearing the judge must consider the presentence report, the psychiatric report, and the evidence in the case or evidence presented at the presentence hearing. The judge then must make findings that (1) the defendant is dangerous, (2) because of the dangerousness of the defendant an extended period of confinement is required for the protection of the public, and (3) the defendant is suffering from a severe personality disorder indicating a propensity toward criminal activity.

ORS 161.735 provides in relevant part:

"(1)  *Whenever, in the opinion of the court, there is reason to believe that the defendant falls within ORS 161.725,* the court shall order a presentence investigation and a psychiatric examination. The court may appoint one or more qualified psychiatrists to examine the defendant or may order that the defendant be taken by the sheriff to a state hospital designated by the Mental Health Division for the examination.

"* * * * *

"(5)  Upon receipt of the psychiatric examination and presentence reports the court shall set a time for a presentence hearing, unless the district attorney and the defendant waive the hearing. At the presentence hearing the district attorney and the defendant may examine the psychiatrist who filed the report regarding the defendant.

"(6)  *If,* after considering the presentence report, the psychiatric report and the evidence in the case or on the presentence hearing, *the court finds that the defendant comes within ORS 161.725, the court may sentence the defendant as a dangerous offender.*" (Emphasis added.)

The current Oregon Criminal Code, of which ORS 161.725 and 161.735 are part, is the product of three years of concerted effort by the Oregon Criminal Law Revision Commission. That commission was created by the 1967 legislature

and submitted its final draft of the code in July 1970. The code (Senate Bill 40) was enacted by the 56th Legislative Assembly, Or Laws 1971, ch 743, and became effective January 1, 1972, as amended.

ORS 161.725 and 161.735 were sections 85 and 86, respectively, of the 1970 final draft, and were approved by the 1971 legislature without amendment.

A review of the legislative history of the dangerous offender statutes is beneficial in explaining our decision on this matter. The official commentary to section 86 of the Proposed Oregon Criminal Code 83 (1970), now ORS 161.735, states:

> "Section 86 establishes the procedures for determining whether a defendant comes within the dangerous offender provision of § 85. The purposes of the section are to provide procedural safeguards for the defendant, *while at the same time furnishing the court with as much information as can be obtained on which to base an intelligent decision.*" (Emphasis added.)

In his testimony before the Senate Criminal Law and Procedure Committee on February 17, 1971, Mr. Donald L. Paillette, the project director for the preparation of the 1970 final draft and report of the Proposed Oregon Criminal Code, was questioned on the intent of section 86. Mr. Paillette stated that the language and intent of section 86 was based on *former* ORS 137.111 to 137.115 (*repealed by* Or Laws 1971, ch 743, § 432) and the Model Sentencing Act, Council of Judges of the National Council on Crime and Delinquency, New York (1963). At that time, ORS 137.111 stated:

> "*After the presentence hearing and upon the consideration of the psychiatric report* required by ORS 137.112 to 137.115, *the court may, in its discretion,* in lieu of any other sentence authorized by law for such crime, *sentence any person convicted* under ORS 163.210, 163.220, 163.270, 167.035, 167.040 or 167.045 *to an indeterminate term not exceeding the natural life of such person if:*
>
> "(1)   The offense involved a child under the age of 16 years; and
>
> "(2)   The court finds that such person has a mental or emotional disturbance, deficiency or condition predisposing him to the commission of any crime punishable under ORS

163.210, 163.220, 163.270, 167.035, 167.040 or 167.045 to a degree rendering the person a menace to the health or safety of others." (Emphasis added.)

The legislature adopted the wording of the 1963 Model Sentencing Act regarding dangerous offender sentencing, which read:

"The defendant shall not be sentenced under subdivision (a) or (b) of section 5 unless he is remanded by the judge before sentence to [diagnostic facility] for study and report as to whether he is *suffering from a severe personality disorder indicating a propensity toward criminal activity;* and the judge, after considering the presentence investigation, the report of the diagnostic facility, and the evidence in the case or on the hearing on the sentence, finds that the defendant comes within the purview of subdivision (a) or (b) of section 5. * * *" 1963 Model Sentencing Act at § 6 (emphasis added).

When asked how the determination of a severe personality disorder would be made, Mr. Paillette acknowledged that the statute provided no specific criteria. The determination of the types of tests, the type of examination, and the diagnosis of any mental disorder would be made by the psychiatrist. Nothing in Mr. Paillette's testimony suggested that he felt a psychiatric diagnosis within the terms of the statute was a prerequisite or essential to the application of the statute if the evidence could be obtained from other sources. This would be consistent with the stated objective of section 86 of placing as much information before the court as possible from which *the court* could make an intelligent decision.

ORS 161.735(6) states:

"If, after *considering the presentence report, the psychiatric report and the evidence in the case or on the presentence hearing, the court finds* that the defendant comes within ORS 161.725, *the court may* sentence the defendant as a dangerous offender." (Emphasis added.)

The commentary to the 1963 Model Sentencing Act did not discuss in any detail how the determination of a "severe personality disorder indicating a propensity toward criminal activity" would be made. In 1972 that wording of the Model Sentencing Act pertaining to dangerous offenders was changed to require the court to find that the defendant "is

suffering from a severe mental or emotional disorder indicating a propensity toward continuing dangerous criminal activity." Model Sentencing Act, *supra* at 7 (2d ed 1972). The comment to this wording specifically refers to the Oregon dangerous offender statutes. It reads:

> "The requirement of diagnosis of severe mental or emotional disorder indicating a propensity toward continuing dangerous criminal activity is admittedly difficult to accept, and we do not dismiss its uncertainties in theory and practice. *The behavioral sciences do not now have sufficient expertise to carry out this assignment adequately. How, then, can the procedure not only be proposed but also (as in Oregon, where the act has been passed) be made operable?*

> "First, contrary to the impression that some people receive or give, the effect of the diagnosis provision will be in general to shorten terms, not to lengthen them. In almost all jurisdictions today, in the absence of usable criteria and wholly at the discretion of the sentencing judge, sentences of thirty years and more are not rare.

> "In contrast a term of such length may, under the Model Act, not be imposed without meeting certain criteria.

> "A diagnostic clinic has no difficulty determining whether a man is suffering from a severe mental or emotional disorder. Relating that kind of diagnosis to a likelihood that he will commit further crimes does present a problem. But even here the Model Act says that the defendant's likelihood of committing further crimes must be supported by his record. *A judge may find,* for example, that a man who committed the type of crime cited in the section did so under unusual circumstances or that he was, shall we say, over twenty-five at the time and had never previously committed such a crime. He is justified in finding that this defendant is not likely to commit that crime again.

> "In the light of today's limited knowledge of prediction of criminal behavior (or any behavior), *we make it clear that the judge, representing society, makes a common-sense decision based on as much relevant information as possible. Sentencing of any offender is a judicial task, not a decision for doctors or behavioral scientists.*

> *"But the expertise of psychologists and psychiatrists can be helpful to the judge.*

> "Our 'Guides to Sentencing the Dangerous Offender' was

produced in response to the question that these comments seek to answer. * * *" *Id.* at 10-11 (emphasis added).

As to the change of wording, the commentary reads:

> "In subdivision 1(c) the language used is 'severe mental or emotional disorder,' contrasting with 'severe personality disorder' in the first edition. The change was adopted because a number of psychiatrists had pointed out that the term 'personality disorder' might be mistakenly construed as the classification of a specific type of disorder. Our intent, now clarified, was to refer to defendants who, in the terms of laymen, were suffering from some mental or emotional disorder and not to limit the disorder to any one specific diagnosis." *Id.*

What is the relevance of the discussion of the Model Sentencing Act's comments to sentencing under its amended language when the Oregon legislature left the statute in its original form calling only for a finding of a "severe personality disorder indicating a propensity toward criminal activity"? It can be relevant only if it reflects the view of the drafters of the 1963 Model Sentencing Act that was the basis for Oregon's law as well as their view of the 1972 text. Of course, the 1972 modification of the Model Sentencing Act that the court must find the defendant "is suffering from a severe mental or emotional disorder indicating a propensity toward continuing dangerous criminal activity" does not change the meaning of the Oregon statutes. However, we do not think the change in language is significant for interpretation purposes. The authors of the Model Sentencing Act assert that the language was changed only to emphasize that the diagnosis would be that of a lay person and not of a behavioral scientist. Both the Oregon statutes and the amended Model Sentencing Act are aimed at dealing with dangerous offenders who are apt to repeat dangerous activity and not offenders who merely repeat non-dangerous criminal activity. The comments to the 1972 Model Sentencing Act therefore may be of some help because the essential meanings of the language of the Model Sentencing Act and the Oregon dangerous offender statutes remain the same.

Although these comments may be helpful, we certainly are not dependent upon them in interpreting the meaning of ORS 161.735(6). The plain wording of that statute mandates that the court must find that defendant is suffering from a "severe personality disorder indicating a propensity toward

criminal activity." The statute clearly states that whether a defendant comes within ORS 161.725 is to be determined by the court upon consideration of not only the psychiatric report but also the presentence report and the evidence in the case or that presented at a presentence hearing. The psychiatric report must be considered, but no words in the statute require that a psychiatrist make the findings of dangerousness or "severe personality disorder * * *." Behavioral scientists agree that "[n]o such entity exists in the nosology of psychiatry." Kozol, Boucher & Garofalo, *The Diagnosis and Treatment of Dangerousness,* 18 Crime & Delinq 371, 378-79 (1972). Accordingly, it devolves upon the legislature or the court to create and develop definitions, criteria and methods in applying the statutes.

The first section of ORS 161.725 provides that the court must find that because of the "dangerousness of the defendant" an extended period of incarceration is required. The legislature did not define "dangerousness." As noted by one commentator, Megargee, *The Prediction of Dangerous Behavior,* 3 Crim Just & Behav 3, 5 (Mar 1976), " 'dangerousness' is an unfortunate term, for it implies there is a trait of 'dangerousness' which, like intelligence, is a relatively constant characteristic of the person being assessed. However, the degree of danger an individual represents to himself or others varies markedly as a function of a number of variables. It is better to eschew the term 'dangerousness' in favor of discussing the problems involved in 'predicting dangerous behavior,' to avoid the trap of affixing permanent labels on changeable people."[1] Megargee then suggests that "dangerous behavior" should be used interchangeably with "violence" and should be applied to a relatively narrow range of acts characterized by the application or overt threat of force which is likely to result in injury to people, including but not restricted to such criminal acts as homicide, mayhem, aggravated assault, forcible rape, battery, robbery, arson and extortion. Kozol, Boucher & Garofalo agree in more general terms, defining "dangerousness" as the potential for inflicting serious bodily harm on another.

---

[1] Monahan, *The Prediction of Violent Behavior,* 27 Crime & Delinq 4-5 (1981), agrees, writing: " 'Dangerousness' confuses issues regarding what one is predicting with the probability one is assigning to its prediction."

At the presentence hearing, in order to make the first finding of dangerousness, the judge must find the defendant has engaged in dangerous behavior that involves a crime of violence against a person. Defendant previously had been convicted of sodomy in the first degree committed against a 10-year-old female victim who had been riding her bicycle. He forced that victim down a bank pushed her to the ground and subjected her to forceful anal intercourse with a threat of death, namely that he would "stick a knife in her back." These acts certainly qualify as dangerous behavior. In this case the crime of sodomy in the first degree was committed against an 11-year-old female victim, defendant's niece. Defendant enticed the child to go to a secluded area. When defendant grabbed the victim from behind and she yelled for help, he placed his hand over her nose and mouth and threatened to cause her to pass out. He then forced her to the ground, removed her pants and underpants, and repeatedly subjected her to forceful anal intercourse. The trial judge made a finding of "dangerousness" in this case, commenting:

> "Now, that statute says that if the Court finds because of the dangerousness of the Defendant an extended period of correctional treatment is required for the protection of the public and further finds that other things exist. Well, first of all, I think I have clearly indicated to you my feeling that you are dangerous, you are shown to be dangerous by your conduct."

The second finding the judge must make is that because of the dangerousness of the defendant, an extended period of confined correction treatment or custody is required for the protection of the public. This finding implies a prediction by the court that the defendant is likely to engage in dangerous behavior and constitutes a future threat of injury or death to other persons. This prediction of future behavior and potential or propensity for inflicting serious bodily harm on another overlaps to some extent the fourth finding the judge must make, that the defendant is suffering from a severe personality disorder indicating a propensity toward criminal activity.

The third finding is simply that the defendant is being sentenced for a Class A felony or that the defendant is being sentenced for a felony that seriously endangered the life or safety of another and has been previously convicted of a

felony not related to the instant crime as a single criminal episode. Here, this defendant was convicted of Sodomy I, a Class A felony.

The statutory language requiring that the court must find that the defendant is suffering from a severe personality disorder indicating a propensity toward criminal activity is most troublesome.[2] We have already mentioned that those words mean that there must be a finding that the defendant is suffering from a severe mental or emotional disorder indicating a propensity toward continuing *dangerous* criminal activity. The statute is a dangerous offender statute, not an habitual offender statute, and it would make no sense for a court to find that someone has engaged in dangerous conduct but has a propensity in the future to continue only non-dangerous criminal activity such as committing forgery. Further, the statute contemplates a severe personality disorder. The statute refers to a mentally abnormal person and not to a dangerous normal person.

According to the Guides for Sentencing, Dangerous Offenders, promulgated by the Council of Judges of the National Council on Crime and Delinquency (2d ed 1974), the essence of the dangerous offender classification is not one specific diagnosis, but any significant mental or emotional disorder or disturbance—a lay concept—and that the finding should be based on the judge's evaluation of all the information gathered, not exclusively on the clinical diagnosis.

These national guides, promulgated two years after the passage of the Oregon dangerous offender statutes, are inadequate in assisting a judge to make one of the most serious sentencing decisions. Neither the Model Act nor the guidelines gives any legal or lay definition of a severe personality

---

[2] The literature on predicting dangerousness is voluminous. Particularly helpful to judges are the following: Cohen, Groth & Siegel, *The Clinical Prediction of Dangerousness,* 24 Crime & Delinq 28 (1978); Kozol, Boucher & Garofalo, *The Diagnosis and Treatment of Dangerousness,* 18 Crime & Delinq 371 (1972); Megargee, *The Prediction of Dangerous Behavior,* 3 Crim Just & Behav 3 (1976); Monahan, *Evaluating Potentially Violent Persons,* Psychology, Psychiatry, & the Law 9 (1980); Monahan, *The Clinical Prediction of Violent Behavior,* 26 Crime & Delinq 278 (1980); Morris, *On "Dangerousness" in the Judicial Process,* 39 Rec A B City NY 102 (1984); Prins, *Literature Review—Dangerous Offenders,* 13 Brit J Soc Work 443 (1983); Scott, *Assessing Dangerousness in Criminals,* 131 Brit J Psychiatry 127 (1977); Shah, *Dangerousness: A Paradigm for Exploring Some Issues in Law and Psychology,* American Psychologist 224 (Mar 1978).

disorder. Further, the comment to the Model Sentencing Act that the judge, representing society, makes a common sense decision based on as much relevant information as possible is much too vague to use as a basis for incarcerating a person for up to 30 years. Although the behavioral scientists seem to agree that the terms used in standard psychiatric diagnosis are almost totally irrelevant to the determination of dangerousness, psychotherapists, including the psychiatrist in this case, do recognize that certain personality disorders can be defined and that persons who have such personality disorders and who have committed dangerous acts can be predictably dangerous.[3]

The disorder described in this case was that of an antisocial personality. That personality is described by the American Psychiatric Association in its Diagnostic and Statistical Manual of Mental Disorders (3d ed 1980), and had been similarly described in prior editions in existence in 1971 at the time this dangerous offender legislation was enacted. We believe that the legislature in utilizing the statutory language referring to dangerousness and persons with severe personality disorders meant to include persons with antisocial personality disorders who have committed violent acts against other persons. We concur with Kozol, Boucher & Garofalo that a person with a severe and a dangerous antisocial personality can best be described as one

> "who has actually inflicted or attempted to inflict serious physical injury on another person; harbors anger, hostility, and resentment; enjoys witnessing or inflicting suffering; lacks altruistic and compassionate concern for others; sees himself as a victim rather than as an aggressor; resents or rejects authority; is primarily concerned with his own satisfaction and with the relief of his own discomfort; is intolerant of frustration or delay of satisfaction; lacks control of his own impulses; has immature attitudes toward social responsibility;

---

[3] Presently, many studies are being made to predict risk assessment of offenders, and some of those studies specifically involve prediction of dangerous or violent offenders. *See, e.g.,* Arizona Board of Pardons and Paroles, Parole Risk Assessment — An Overview (Feb 1986); Baird & Lerner, A Survey of the Use of Guidelines and Risk Assessments by State Parole Boards, National Council on Crime and Delinquency (1985); Fischer, Prediction and Incapacitation: Issues and Answers (Jan 1985); Petersilia, Turner, Kahan & Peterson, Granting Felons Probation — Public Risks and Alternatives (Jan 1985). We do not rule out the utilization of these risk assessment tools when they become available for application to the dangerous offender statutes.

lacks insight into his own psychological structure; and distorts his perception of reality in accordance with his own wishes and needs. The essence of dangerousness appears to be a paucity of feeling concern for others." 18 Crime & Delinq at 379.

A judge can turn to the American Psychiatric Association manual for assistance in determining whether a person who has engaged in violent behavior possesses the diagnostic criteria for antisocial personality disorder. The DSM III sets forth the following criteria:

**"Diagnostic criteria for Antisocial Personality Disorder**

"A. Current age at least 18:

"B. Onset before age 15 as indicated by a history of three or more of the following before that age:

"(1) truancy (positive if it amounted to at least five days per year for at least two years, not including the last year of school)

"(2) expulsion or suspension from school for misbehavior

"(3) delinquency (arrested or referred to juvenile court because of behavior)

"(4) running away from home overnight at least twice while living in parental or parental surrogate home

"(5) persistent lying

"(6) repeated sexual intercourse in a casual relationship

"(7) repeated drunkenness or substance abuse

"(8) thefts

"(9) vandalism

"(10) school grades markedly below expectations in relation to estimated or known IQ (may have resulted in repeating a year)

"(11) chronic violations of rules at home and/or at school (other than truancy)

"(12) initiation of fights

"C. At least four of the following manifestations of the disorder since age 18:

"(1) inability to sustain consistent work behavior, as

indicated by any of the following: (a) too frequent job changes (e.g., three or more jobs in five years not accounted for by nature of job or economic or seasonal fluctuation), (b) significant unemployment (e.g., six months or more in five years when expected to work), (c) serious absenteeism from work (e.g., average three days or more of lateness or absence per month), (d) walking off several jobs without other jobs in sight (Note: similar behavior in an academic setting during the last few years of school may substitute for this criterion in individuals who by reason of their age or circumstances have not had an opportunity to demonstrate occupational adjustment)

"(2)    lack of ability to function as a responsible parent as evidenced by one or more of the following: (a) child's malnutrition, (b) child's illness resulting from lack of minimal hygiene standards, (c) failure to obtain medical care for a seriously ill child, (d) child's dependence on neighbors or nonresident relatives for food or shelter, (e) failure to arrange for a caretaker for a child under six when parent is away from home, (f) repeated squandering, on personal items, of money required for household necessities

"(3)    failure to accept social norms with respect to lawful behavior, as indicated by any of the following: repeated thefts, illegal occupation (pimping, prostitution, fencing, selling drugs), multiple arrests, a felony conviction

"(4)    inability to maintain enduring attachment to a sexual partner as indicated by two or more divorces and/or separations (whether legally married or not), desertion of spouse, promiscuity (ten or more sexual partners within one year)

"(5)    irritability and aggressiveness as indicated by repeated physical fights or assault (not required by one's job or to defend someone or oneself), including spouse or child beating

"(6)    failure to honor financial obligations, as indicated by repeated defaulting on debts, failure to provide child support, failure to support other dependents on a regular basis

"(7)    failure to plan ahead, or impulsivity, as indicated by traveling from place to place without a prearranged job or clear goal for the period of travel or clear idea about when the travel would terminate, or lack of a fixed address for a month or more

"(8)    disregard for the truth as indicated by repeated lying, use of aliases, 'conning' others for personal profit

"(9)    recklessness, as indicated by driving while intoxicated or recurrent speeding

"D.    A pattern of continuous antisocial behavior in which the rights of others are violated, with no intervening period of at least five years without antisocial behavior between age 15 and the present time (except when the individual was bedridden or confined in a hospital or penal institution).

"E.    Antisocial behavior is not due to either Severe Mental Retardation, Schizophrenia or manic episodes." DSM III at 320-21.

The DSM III manual also is helpful in defining a personality disorder. The manual explains:

"Personality traits are enduring patterns of perceiving, relating to, and thinking about the environment and oneself, and are exhibited in a wide range of important social and personal contexts. It is only when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress that they constitute Personality Disorders. * * *" *Id.* at 295.

The manual also describes other personality disorders that may be relevant for application in other cases. The manual presently lists the following personality disorders: Schizoid, Avoidant, Antisocial, Passive-Aggressive and Borderline Personality Disorders. *Id.* at 305.

We now turn to the present case to determine if the trial judge made the necessary findings within these definitions to apply the dangerous offender statute. After finding that defendant was dangerous and had committed a Class A felony, the court addressed the issue whether defendant needed to be isolated for the protection of society. He stated:

"* * * [T]his case is simply beyond any effort to deal with * * * outside of a prison setting. * * *

"* * * [R]ehabilitation can happen * * * inside and that's up to you. Frankly though my concern here is protection of society, specifically protection of minor females.

"The history that I am dealing with speaks with a loud voice. There are two prior convictions. One for Sodomy in the First Degree, one for Rape in the First Degree. Both involve female victims. One was 10, one was 16. The circumstances of

those cases although perhaps more aggravated in some respects, are basically the same sorts of things that occurred here.

"There are a number of things that dictate to my mind that a maximum sentence is appropriate and to my mind the question is, what maximum sentence the law allows. Things that to my mind mandate that kind of sentence as a protection of society are the degree of the abuse or threatened use of force, the age of the victim, the past history that I referred to, and * * * the fact that you were on temporary leave status at the time that this occurred * * *."

The court then addressed the key issue whether this defendant was suffering from a severe personality disorder as described in ORS 161.725(1). The court noted that a psychiatrist who examined defendant had concluded that defendant did not suffer from a severe personality disorder with a propensity toward criminal activity. However, as previously mentioned, the court is not bound by the conclusions of any psychotherapist but is required by statute to make his or her own findings on that issue. Expert opinion is admissible if it may be helpful to the trier of fact, *see* OEC 702, but the trier of fact is not bound by any expert's opinion. The judge stated that although he respected Dr. Holland's opinion, he simply disagreed with it and felt that, as the trial judge, he was free to make his own determination after reviewing the psychiatric evidence, presentence report and other evidence available. The trial judge, in making his own findings, stated:

"The factors which I think the Court has to determine [are] whether or not there is a personality disorder. Dr. Holland did say there was an antisocial personality. That is a personality disorder. The question is, is it severe? He equates severity with a particular antisocial personality disorder. I think you can also look at severity in terms of looking at a person's past in terms of looking at the case, and in terms of the extent of your criminal history, and particularly in terms of the history of sexual offenses. I think it's severe. I am convinced that it's severe and without a doubt it leads to a criminal activity."

The judge was justified in making this finding. We note that the prosecutor, the defense attorney and Dr. Holland each used or referred to the manual and agreed that the diagnostic criteria in DSM III for an antisocial personality

disorder are "most explicit." The judge observed that Dr. Holland relied on this manual for his diagnosis and that in his report he stated that the Minnesota Multiphasic Personality Inventory (MMPI) diagnosed defendant as having an antisocial personality.

It does not take a psychiatrist to utilize the criteria for an antisocial personality as set forth in DSM III. It does not take a psychiatrist to add up the number of diagnostic criteria. This defendant before age 15 had a history of four of the criteria. The manual states that there must be "at least three." This defendant had been (1) expelled from Coquille High School for misbehavior, (2) arrested, referred to juvenile court because of delinquent behavior and committed to McLaren School for Boys, not once but twice, (3) stole an automobile and committed a burglary, and (4) chronically violated rules at his home in that he was taken from the home and failed to adjust in foster care. As to his adult behavior, he (1) failed to accept social norms with respect to lawful behavior in that he was arrested on multiple occasions resulting in at least two felony convictions; (2) demonstrated irritability and aggressiveness, physically assaulting various victims; he was convicted of menacing and assault in the third degree; (3) demonstrated a failure to plan ahead and acted impulsively in that he absconded from supervision; (4) demonstrated recklessness by driving while intoxicated and in another incident attempted to elude a police officer; and (5) engaged in a pattern of continuous antisocial behavior in which he violated the rights of others, particularly the rights of young girls: he forced a 10-year-old to suffer the indignity of anal sodomy at knifepoint and raped a 16-year-old after using a weapon with threats of death. Dr. Holland failed to set forth or comment on these facts and their application to a diagnosis under DSM III. The trial judge was fully justified to reject the psychiatrist's conclusion and to properly sum up defendant as a dangerous offender requiring an "extended period of confinement for the protection of society who had been convicted of Class A felonies and who is suffering from a severe personality disorder indicating a propensity toward criminal activity" as those terms have been interpreted in this opinion.

The principal purpose of the dangerous offender statutes is to focus special attention on the dangerous offender. The drafters of the Model Sentencing Act, the Act upon which

ORS 161.725 and 161.735 were based, contemplated that very few defendants would be found to be dangerous offenders. Not more than 100 persons would have to be confined in a single maximum security institution, which would be staffed for genuine treatment. One hundred twenty-nine convicted felons are presently confined in Oregon prisons as dangerous offenders. In adopting the essence of the Model Sentencing Act, the Oregon legislature did not rule out the possibility of rehabilitation of dangerous offenders. Upon petition of the offender that status is subject to review. ORS 144.226 provides for psychiatric review every two years of any person sentenced under ORS 161.725 and 161.735. ORS 144.228 provides that if the condition which made the prisoner dangerous is absent or in remission the prisoner shall be given a release date in accordance with the parole matrix. Otherwise, the prisoner will serve the full sentence less good time credits.

■ The application of the dangerous offender statutes requires careful and complete findings by a judge. To recap, for a sentencing judge to apply ORS 161.725 and 161.735 to a defendant, the judge must first declare that he has reason to believe that because of the dangerousness of the defendant an extended period of confinement is required for the protection of the public and make appropriate findings on the record to justify that belief. The judge must also find the defendant is being sentenced for a Class A felony or a felony that seriously endangered the life or safety of another and has been previously convicted of a felony not related to the instant crime as a single criminal episode.

■ After making these findings, the judge must order a presentence report and psychiatric examination of the defendant. The judge should not merely make a general referral; rather, the judge should specify whatever clues or questions he or she has. If some element in the crime or some facet of the defendant's history puzzles the judge, he or she should make his query specific. Details of the crime should be made known to the psychiatrist, and whatever denial of the facts is made by the defendant should also be presented. After receiving these reports, the judge then must conduct a presentence hearing unless waived by the defendant. At the hearing the judge must consider the presentence report, the psychiatric report, and the evidence in the case or evidence presented at the presentence hearing. The court then must make findings whether (1)

the defendant is dangerous, (2) because of the dangerousness of the defendant an extended period of confinement is required for the protection of the public, and (3) the defendant is suffering from a severe personality disorder indicating a propensity toward criminal activity.

The dangerous offender statutes were properly applied in this case by the sentencing judge.

The Court of Appeals and the trial court are affirmed.