Argued and submitted November 5, 1996, decision of Court of Appeals reversed; order of Psychiatric Security Review Board vacated and case remanded to Board for reconsideration May 30, 1997

## DONALD RAYMOND MUELLER,
*Petitioner on Review,*

*v.*

## PSYCHIATRIC SECURITY REVIEW BOARD,
*Respondent on Review.*

(PSRB 85-751; CA A82643; SC S42936)

937 P2d 1028

Harris S. Matarazzo, Portland, argued the cause and filed the petition for petitioner on review.

Katharine H. Waldo, Assistant Attorney General, Salem, argued the cause for respondent on review. With her on the briefs were Theodore R. Kulongoski, Attorney General, Virginia L. Linder, Solicitor General, and Jas. Adams, Assistant Attorney General.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Fadeley, Graber, and Durham, Justices.

GRABER, J.

Fadeley, J., filed a specially concurring opinion.

## GRABER, J.

A trial court committed petitioner to the jurisdiction of the Psychiatric Security Review Board (PSRB) in 1985. At a hearing before the PSRB in November 1993, petitioner sought discharge or conditional release. The PSRB concluded that petitioner was affected by a mental disease or defect and that he presented a substantial danger to others. Based on those conclusions, the PSRB denied petitioner's request for discharge. Additionally, the PSRB denied petitioner's request for conditional release on the basis that the necessary treatment and supervision were not available. The Court of Appeals affirmed the order without opinion. *Mueller v. PSRB*, 134 Or App 671, 896 P2d 18 (1995). We reverse the decision of the Court of Appeals, vacate the PSRB's order, and remand the case to the PSRB for reconsideration.

Petitioner, now 30 years old, has spent most of the years since he was 10 in state hospitals and institutions. His current confinement resulted from acts that he committed in 1984, when he was 18 years old. Petitioner broke into a neighbor's house, stole some record albums, and vandalized the premises. In January 1985, a trial court found petitioner guilty except for insanity of first-degree burglary. Placing petitioner under the PSRB's jurisdiction for a period not to exceed 20 years, the court conditionally released petitioner in February 1985. In making its decision, the court relied, in part, on a psychiatrist's report based on an evaluation of petitioner performed at the jail in December 1984.[1] The psychiatrist diagnosed petitioner as suffering from "[s]chizo-affective disorder, meaning that he has mood swings and also has a thought disorder," on Axis I; "[b]orderline personality disorder, meaning that he lives in a state of considerable emotional instability," on Axis II; and "[c]erebral palsy which is longstanding and manifested by spasticity of his arms and legs," on Axis III.[2]

---

[1] The trial court also relied on petitioner's records from Dammasch State Hospital and Oregon State Hospital (OSH). Petitioner was discharged from OSH on August 24, 1984, about three months before he committed the burglary. His diagnosis at the time of discharge was essentially the same as his December 1984 diagnosis. However, he had been given various diagnoses during his confinement at the two hospitals.

[2] The *Diagnostic and Statistical Manual of Mental Disorders* (3d ed 1980) (DSM-III) is a reference work compiled by the American Psychiatric Association

The PSRB revoked petitioner's conditional release on July 23, 1985, after petitioner tried to strangle his 16-year-old brother. Petitioner was committed to Oregon State Hospital (OSH), where he was diagnosed on July 24, 1985, as suffering from childhood onset pervasive developmental disorder, residual, on Axis I; borderline personality disorder, on Axis II; and cerebral palsy, on Axis III.

A physician noted in 1988 that "the most suitable diagnoses for [petitioner] remain unclear" and that petitioner has been given a variety of possible diagnoses over the years. In 1989, an OSH physician diagnosed petitioner as suffering from an organic personality disorder, on Axis I; personality disorder, not otherwise specified, with borderline and anti-social traits, on Axis II; and speech impediment, on Axis III. Similar diagnoses have been repeated throughout the remainder of petitioner's confinement, except that the subsequent Axis III diagnosis has been cerebral palsy.

At the PSRB hearing in November 1993, petitioner asked to be discharged or conditionally released or, in the alternative, to be evaluated by a community mental health agency.[3] The hearing was held pursuant to ORS 161.341(4),[4] and the state had the burden of proving that petitioner should remain under the PSRB's jurisdiction. ORS 161.341(5). Petitioner and Dr. Jobe, his treating physician since 1990, were the only witnesses at that hearing. In his

---

that categorizes mental disorders. The DSM-III uses five axes for classifying disorders. The first two axes are for mental disorders, and the third is for physical disorders and conditions. The DSM-III and its multiaxial evaluation system are discussed more fully later in this opinion. 325 Or at 339-40.

[3] Before the November 1993 hearing, petitioner had received eight hearings before the PSRB. Following each hearing, the PSRB denied petitioner's requests for discharge or conditional release.

[4] ORS 161.341(4) provides:

"Any person who has been committed to a state hospital designated by the Mental Health and Developmental Disability Services Division for custody, care and treatment or another person acting on the person's behalf may apply to the board for an order of discharge or conditional release upon the grounds:

"(a) That the person is no longer affected by mental disease or defect;

"(b) If so affected, that the person no longer presents a substantial danger to others; or

"(c) That the person continues to be affected by a mental disease or defect and would continue to be a danger to others without treatment, but that the person can be adequately controlled and given proper care and treatment if placed on conditional release."

last progress note update, dated November 18, 1993, Jobe diagnosed petitioner as having an organic personality disorder, on Axis I; personality disorder, not otherwise specified, with borderline and antisocial traits, on Axis II; and cerebral palsy, on Axis III.

Jobe testified that he preferred the diagnosis of "organic personality disorder" over the diagnosis of pervasive developmental disorder that initially was assigned to petitioner. He explained that the organic etiology of the organic personality disorder is cerebral palsy at birth. Jobe further testified that petitioner's organic personality disorder impairs his judgment and makes him impulsive and that, because of the organic etiology, petitioner "will always suffer these impairments." Jobe testified that petitioner would present a substantial danger to others if he were discharged and that he would need a supervised, 24-hour facility if he were released conditionally. Petitioner testified briefly about his janitorial job and promised to obey the rules if he were released conditionally.

In an order dated December 1, 1993, the PSRB made the following findings of fact:

"2. [Petitioner] is affected by a mental disease or defect as demonstrated by the underlying facts shown by the evidence including the testimony of David Jobe, M.D. at the hearing as well as information contained in [particular exhibits]. [5]

"3. [Petitioner], without adequate supervision and treatment, would continue to present a substantial danger to others as demonstrated by the underlying facts shown by the evidence including the testimony of David Jobe, M.D., at the hearing as well as the information contained in [particular exhibits].

"* * * * *

"5. [Petitioner] could be adequately controlled and treated in the community if he were conditionally released. This finding is based upon the testimony of David Jobe,

---

[5] Exhibits to which the PSRB's order refers diagnose petitioner with an "organic personality disorder," among other things.

M.D. at the hearing as well as the information contained in [an exhibit]."

The PSRB concluded as a matter of law that:

"1. [Petitioner], being affected by a mental disease or defect which, when active, renders him a substantial danger to others, is under the jurisdiction of the Psychiatric Security Review Board.

"2. [Petitioner] is a proper subject for conditional release, however, the supervision and treatment necessary are not currently available in the community; therefore, it would not be in the best interest of justice and the protection of society to release him at this time."

The PSRB retained jurisdiction over petitioner pursuant to ORS 161.346(1) and ordered that a community mental health agency designated by OSH staff evaluate him for possible conditional release placement in an appropriate program.

As noted, petitioner appealed the order to the Court of Appeals, which affirmed without a written opinion. We allowed petitioner's petition for review.

Petitioner argues that the record lacks substantial evidence to support the PSRB's finding that he suffers from a mental disease or defect. We address his argument in two parts. First, because petitioner was diagnosed with an organic personality disorder at the time of his PSRB hearing, we address whether that condition constitutes a mental disease or defect. Second, we discuss whether the record contains substantial evidence to support a finding that petitioner has an organic personality disorder.

The legislature has not defined the term "mental disease or defect" directly. However, ORS 161.295(2), a statute relating to criminal responsibility, provides, in part:

"[T]he terms 'mental disease or defect' do not include * * * any abnormality constituting solely a personality disorder."

See also ORS 161.295(1) (describing conditions for verdict of "guilty except for insanity"). The PSRB has adopted a rule that also excludes personality disorders from the definition of "mental disease or defect." OAR 859-10-005(4) (1987) provided, in part:

" 'Mental Disease or Defect'. The Board shall not discharge a person whose mental disease or defect may, with reasonable medical probability, occasionally become active, and when active, render the person a danger to others:

"* * * * *

"(b)  For offenses committed on or after January 1, 1984, the term 'mental disease or defect' does not include any abnormality constituting solely a personality disorder."

In addition, the PSRB has adopted rules in which it defines the terms "mental disease" and "mental defect." Before a 1995 amendment,[6] OAR 859-10-005(5) and (6) (1987) defined those terms as follows:

"(5)  'Mental Disease'. Mental disease is defined as any diagnosis of mental disorder which is a significant behaviorial [sic] or psychological syndrome or pattern that is associated with distress or disability causing symptoms or impairment in at least one important area of an individual's functioning and is defined in the current Diagnostic and Statistical Manual of Mental Disorders (DSM) of the American Psychiatric Association.

"(6)  'Mental Defect'. Mental defect is defined as mental retardation, brain damage or other biological dysfunction that is associated with distress or disability casuing [sic] symptoms or impairment in at least one important area of an individual's functioning and is defined in the current Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association." OAR 859-10-005 (1987).

Petitioner argues that his "organic personality disorder" falls under the statutory exclusion for "personality disorders" and that he therefore does not have a mental disease or defect within the meaning of the statute and rules. By contrast, the PSRB asserts that an "organic personality disorder" is distinct from a "personality disorder" that is excluded under ORS 161.295(2) and the applicable rules and that an organic personality disorder constitutes a mental disease or defect. Therefore, the PSRB argues, it has jurisdiction over petitioner.

---

[6] The PSRB amended OAR 859-10-005(5) and (6) in 1995 to refer to the DSM-IV and renumbered those provisions as OAR 859-10-005(4) and (5).

In interpreting a statute, our task is to ascertain the legislature's intent in enacting the statute. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). Similarly, when interpreting a rule, our task is to ascertain the intent of the agency that adopted it. *Osborn v. PSRB*, 325 Or 135, 145, 934 P2d 391 (1997). We begin by analyzing the text and context of ORS 161.295(2) and of OAR 859-10-005(4) (1987).

As noted, the text of ORS 161.295 does not define the term "personality disorder." However, the term is defined in the *Diagnostic and Statistical Manual of Mental Disorders* (3d ed 1980) (DSM-III). *See Osborn*, 325 Or at 147 (explaining why the DSM-III is the pertinent referent). The DSM-III was the standard reference work used by clinicians, researchers, and other practitioners in the psychiatric community at the time that the PSRB adopted OAR 859-10-005(5) and (6) (1987). The manual provides a "common language" in which clinicians and research investigators can communicate about mental disorders. DSM-III at 1. The DSM-III is published by the American Psychiatric Association. It compiles a list of mental disorders and sets forth the diagnostic criteria for each.

The legislature enacted ORS 161.295 in 1971, Or Laws 1971, ch 743, § 36, without an exclusion for personality disorders. The legislature amended that statute in 1983 to add the exclusion for "any abnormality constituting solely a personality disorder." Or Laws 1983, ch 800, § 1. At that time, the DSM-III was the extant version of the DSM, having been published in 1980.

Because the phrase "personality disorder" is a term of art as to which the DSM-III was the definitive source, this court has referred to the DSM for guidance in cases involving individuals with mental diseases or defects. *See, e.g., State v. Huntley*, 302 Or 418, 431-36, 730 P2d 1234 (1986) (relying on the DSM-III to interpret the term "severe personality disorder" as used in a dangerous offender statute); *McGarrah v. SAIF*, 296 Or 145, 163 n 10, 675 P2d 159 (1983) (noting that many prominent psychotherapists compiled the manual, which comprehensively describes the manifestations of mental disorders). In particular, this court has stated that the

DSM-III "is helpful in defining a personality disorder." *Huntley*, 302 Or at 434.

Moreover, OAR 859-10-005(5) and (6) (1987) incorporated the DSM-III by reference to define mental disease and mental defect. *See Osborn*, 325 Or at 147 (so holding). The PSRB's rules thus contemplate that the DSM-III is the appropriate reference. We turn, then, to that document.

The DSM-III uses a multiaxial evaluation system for classifying disorders, and each axis conveys a different class of information. DSM-III at 23. Axis I consists of clinical syndromes and V Codes.[7] Axis II consists of developmental disorders and personality disorders. All mental disorders fall within those two axes and are addressed in the DSM-III. *Ibid.* Axis III is for physical disorders and conditions.[8]

Three aspects of the DSM-III bear on the issue before us. First, the DSM-III does not use the diagnostic term "organic personality disorder." Rather, it uses the diagnostic term "organic personality syndrome."[9] That being so, the premise of petitioner's argument—that the legislature and the PSRB *must* have contemplated that this condition is merely a type of personality disorder because of the parallel wording—is absent.

Second, the DSM-III places "organic personality syndrome" on Axis I. Under the DSM-III, Axis I disorders are mental disorders or conditions *other than* personality disorders and specific developmental disorders. DSM-III at 23. By

---

[7] A "V Code" is a "behavioral or psychological problem [that] may appropriately be a focus of professional attention or treatment even though it is not attributable to a mental disorder." DSM-III at 6. Petitioner's diagnosis does not include any V Codes.

[8] The other two axes are Axis IV, Severity of Psychosocial Stressors, and Axis V, Highest Level of Adaptive Functioning Past Year. Those axes provide information supplementing the official DSM-III diagnoses (Axes I, II, and III) that may be useful for treatment planning, DSM-III at 8, but are not relevant to petitioner's case.

[9] In the listing of mental disorders at the beginning of the DSM, the DSM-III assigns the numerical code 310.10 to "organic personality syndrome." DSM-III at 16. The DSM-III-R, a later version published in 1987, assigns that same numerical code to "organic personality disorder," DSM-III-R at 6, yet the text discussing 310.10 refers to "organic personality syndrome," DSM-III-R at 114. The diagnostic criteria for "organic personality syndrome" are similar in those two versions of the DSM. DSM-III at 119-20; DSM-III-R at 115-16.

contrast, "personality disorders" are classified on Axis II. *Id.* at 305. A number of specific types of personality disorders fall under the umbrella term "personality disorder." *See id.* at 307 (listing subtypes of personality disorders). Organic personality syndrome is not included.[10]

Third, the definitions of "organic personality syndrome" and "personality disorder" show that the former is not "*solely* a personality disorder," as ORS 161.295(2) requires for the exclusion to apply. (Emphasis added.)

The DSM-III states that the "essential feature" of organic personality syndrome is "a marked change in personality that is due to a specific organic factor but that is not due to any other Organic Brain Syndrome."[11] *Id.* at 118. The DSM-III lists the following diagnostic criteria for organic personality syndrome:

"A.  A marked change in behavior or personality involving at least one of the following:

"(1)  emotional lability, e.g., explosive temper outbursts, sudden crying

"(2)  impairment in impulse control, e.g., poor social judgment, sexual indiscretions, shoplifting

"(3)  marked apathy and indifference, e.g., no interest in usual hobbies

"(4)  suspiciousness or paranoid ideation

"B.  No clouding of consciousness, as in Delirium; no significant loss of intellectual abilities, as in Dementia; no predominant disturbance of mood, as in Organic Affective Syndrome; no predominant delusions or hallucinations, as in Organic Delusional Syndrome or Organic Hallucinosis.

---

[10] Axis I and Axis II disorders are separated in the DSM-III to ensure "that consideration is given to the possible presence of [Axis II personality and developmental] disorders that are frequently overlooked when attention is directed to the usually more florid Axis I disorder." DSM-III at 23.

[11] The DSM-III distinguishes between organic brain syndromes and organic mental disorders as follows:

" 'Organic brain syndrome' is used to refer to a constellation of psychological or behavioral signs and symptoms without reference to etiology * * *; 'organic mental disorder' designates a particular organic brain syndrome in which the etiology is known or presumed * * *." DSM-III at 101.

"C. Evidence, from the history, physical examination, or laboratory tests, of a specific organic factor that is judged to be etiologically related to the disturbance.

"D. This diagnosis is not given to a child or adolescent if the clinical picture is limited to the features that characterize Attention Deficit Disorder * * *." *Id.* at 119-20.

By contrast, with respect to personality disorders, the DSM-III explains:

"Personality *traits* are enduring patterns of perceiving, relating to, and thinking about the environment and oneself, and are exhibited in a wide range of important social and personal contexts. It is only when *personality traits* are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress that they constitute *Personality Disorders*." *Id.* at 305 (emphasis in original).

Thus, personality disorders are *not* characterized by an organic etiology as is organic personality syndrome. Neither is a personality disorder characterized by a *"marked change in behavior or personality"*; rather, it is characterized by *"enduring patterns"* that are "inflexible and maladaptive." *Id.* at 119, 305 (emphasis added).

In summary, "personality disorders" and "organic personality syndrome" are two different and distinct types of mental disorders within the meaning of the DSM-III, which the applicable rule incorporates by reference. The two are placed on different axes, and each has a different origin and different manifestations. Based on our analysis of the text and context of ORS 161.295(2) and of OAR 859-10-005(4) (1987), we conclude that an "organic personality syndrome" does not constitute *"solely* a personality disorder." (Emphasis added.) Thus, an organic personality syndrome is a mental disease or defect within the meaning of ORS 161.295(2) and OAR 859-10-005(4) (1987).

Because of the foregoing, we reject petitioner's argument that the PSRB's jurisdiction over him is inconsistent with *Martin v. PSRB*, 312 Or 157, 818 P2d 1264 (1991). In that case, this court stated that the PSRB does not have jurisdiction over an individual who suffers "from a personality

disorder accompanied by a *past or future possibility of decompensation* to mental disease or defect." 312 Or at 165-66 (emphasis in original). The evidence here is that petitioner *currently* suffers from organic personality syndrome, a separate Axis I condition, in addition to a personality disorder. Thus, the holding in *Martin* is not applicable to the case now before us.

■ We next are called on to determine whether the record contains substantial evidence to support the PSRB's finding that petitioner suffers from a mental disease or defect. "Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding." ORS 183.482(8)(c).

Because we have concluded that organic personality syndrome is a mental disease or defect, the question now is whether the record supports a finding that petitioner suffers from that mental disease or defect. The record consists of the testimony at petitioner's PSRB hearing as well as 81 exhibits, including psychological evaluations, case summaries, progress note updates, and other reports by OSH staff.

Based on that evidence, the PSRB found that petitioner suffers from an organic personality disorder. However, in doing so, the PSRB appears to have relied on the DSM-III-R, a later version published in 1987, rather than on the DSM-III. Although the PSRB did not specifically refer to the DSM-III-R in its order, we nevertheless draw that conclusion, because every exhibit that contained a diagnosis between October 1989 and the November 1993 hearing had assigned the code 301.90 to petitioner's Axis II personality disorder. That code, which indicates a "personality disorder, not otherwise specified," does not exist in the DSM-III but does exist in the DSM-III-R. Because the DSM-III is the edition that should have been applied and because its use might have affected the outcome, we remand the case to the PSRB for reconsideration to determine whether petitioner meets the diagnostic criteria for organic personality syndrome that are set forth in the DSM-III.

The decision of the Court of Appeals is reversed. The order of the Psychiatric Security Review Board is vacated, and the case is remanded to the Board for reconsideration.

**FADELEY, J.,** specially concurring.

I agree that the Psychiatric Security Review Board (PSRB) order must be vacated and the case remanded to that agency for reconsideration. I would so hold based on the provisions of a statute, without reference to any version of the *Diagnostic and Statistical Manual of Mental Disorders*.

ORS 161.295(2) provides, in part:

"[T]he terms 'mental disease or defect' do not include * * * any abnormality constituting solely a personality disorder."

A PSRB rule, OAR 859-10-005(4)(b) (1987), repeats that exclusion in the exact words of the statute. The issue in this case is whether those words cover a personality disorder that arises organically, as Dr. Jobe testified, from the birth defect of cerebral palsy.

The evidence at the PSRB hearing as to petitioner's condition at that time was limited to that disorder. Therefore, that "organic personality disorder" is the only condition on which the PSRB could have based its order continuing petitioner in its custody.[1] I believe that the above-quoted statute expressly exempts organic personality disorders from the kinds of mental diseases and defects over which the PSRB may continue its jurisdiction. Where that is the case, ORS 161.351(1) provides, in part:

"Any person placed under the jurisdiction of the [PSRB] * * * shall be discharged at such time as * * * the person is no longer affected by mental disease or defect [as defined in ORS 161.295(2)]* * *."

On this record, vacating the continuation order and remanding to the PSRB is appropriate. Given the statutory

---

[1] At the time, over ten years ago, when petitioner was convicted of burglary "except for insanity," he was diagnosed with the specific mental disease of schizoaffective disorder and committed to the jurisdiction of the PSRB. However, for much more than the two years prior to the ORS 161.341(4) hearing that is the foundation for the present case, that disease has not been found by his doctors to be present. Instead, petitioner is diagnosed as suffering from an "organic personality disorder." The word "organic" merely confirms that his "personality disorder" is physically caused by his condition at birth, cerebral palsy. There was no other testimony before the PSRB in the present hearing. The recitation in the main opinion of past testimony and reports was not referred to or relied on by the PSRB in its order continuing jurisdiction.

determination that a condition that is "solely a personality disorder" is not a "mental disease or defect," ORS 161.295(2), I do not see in the record before us the basis for the PSRB's continuing jurisdiction over petitioner.

Nor do I willingly join in the further, advance discussion of how the case might turn out on remand, a discussion based on the *Diagnostic and Statistical Manual of Mental Disorders-III* (3d ed 1980) (DSM-III). The PSRB record in the specific hearing that is the foundational basis for this judicial review does not show that the PSRB relied in any way on the material in the DSM-III. It relied only on the evidence, which stated that petitioner's present condition is an "organic personality disorder."

Even assuming that the PSRB did rely on the DSM-III, that text does not indicate that the statutory exclusion does not apply or that it is somehow overridden. The DSM-III provides no basis for avoiding the mandatory words of a relevant statute. Moreover, its provisions do not gainsay that petitioner's present mental condition falls within the coverage of the statutory exception. Instead, the DSM-III's provisions appear to leave intact the applicability to petitioner of the statutory exception.

The DSM-III is a description and classification system for various medical diagnoses of various mental conditions. It is intended to provide a common language and frame of reference for mental health professionals.

The DSM-III uses what it refers to as a multiaxial evaluation of "every case" to provide a diagnostic *description*. As stated in the DSM-III at 23, each axis "refers to a different class of *information*." (Emphasis added.) It is different "information" to which the DSM-III appears to refer as to each axis, not a different, discrete diagnosis. As stated there, Axis I includes "Clinical Syndromes"; Axis II includes "Personality Disorders"; Axis III includes "Physical * * * Conditions." DSM-III at 23.

The DSM-III expands on its descriptive diagnosis format, as follows:

> "In DSM III a distinction is made between organic *brain syndromes* and organic *mental disorders* * * *; 'organic

mental disorder' designates a particular organic brain syndrome in which the etiology is known or presumed." *Id.* at 101 (emphasis in original).

That passage from the DSM-III implies that a "syndrome" is *not* necessarily a separate entity from a "disorder" because a "disorder" *is* a particular *syndrome. Id.* at 101-03. When the "etiology is known or presumed," as it is in this case, the syndrome is called a disorder but remains one and the same entity, it appears.

The DSM-III also defines the word "personality" for its use in the DSM-III, as follows:

"Deeply ingrained patterns of behavior, which include the way one relates to, perceives, and thinks about the environment and oneself. Personality *traits* are prominent aspects of personality, and do not imply pathology. Personality *disorder* implies inflexible and maladaptive patterns of sufficient severity to cause either significant impairment in adaptive functioning or subjective distress." *Id.* at 366 (emphasis in original).

Nothing in the above text takes this case out of the ORS 161.295(2) exception.[2] As stated, according to the testimony at the hearing the word "organic" merely signifies that the "personality disorder" arises from a known organic etiology.

The final order of the PSRB, as compared with the testimony before it, does *not* include any finding of fact of any specific diagnosis. Indeed, the order neither mentions nor relies on any diagnosis. It includes only the bare conclusion that petitioner is "affected by a mental disease or defect." There is no explanation of what disease or defect the PSRB thinks is present. Based on the limited record that is before us, I conclude that the diagnosis "organic personality disorder" remains that of "solely a personality disorder" that is exempt from PSRB jurisdiction under ORS 161.295(2), OAR 859-10-005(4)(b) (1987), and ORS 161.351. Of course, more information may be placed in the record on remand, if it is available.

---

[2] Of course, the exception relates only to PSRB jurisdiction and custody, not to other forms of institutionalization.

The main opinion's further discussion depends on this court's making a rediagnosis or differently worded diagnosis than that present in the record. The PSRB's responding brief refers to petitioner's condition as " 'organic personality disorder.' " (Quotation marks in original.) It does not use the terminology "organic personality syndrome," found in the main opinion. 325 Or at 341. Likewise, the PSRB's briefs in the Court of Appeals and petitioner's briefs in the Court of Appeals use "organic personality *disorder*," not the main opinion's "syndrome" language. The petition for review uses only personality "disorder," not "syndrome."

The PSRB's response brief does not justify a switch to the "syndrome" terminology. It argues that "organic personality *disorder*" is a separate mental entity from "personality *disorder*." That response brief does not urge or state that there was in the record any separate "syndrome" diagnosis. The main opinion strays from the argument of the PSRB by denominating the condition as an "organic personality *syndrome*," rather than using the wording relied on by the parties.[3] But, as indicated above, even if the change in terminology to "syndrome" had been argued to the court, where the DSM-III indicates that the specific syndrome is an organic personality disorder, as appears to be the case here, the statutory exception still potentially would apply.

I do not join in the main opinion's rediagnosis, nor do I join in the underlying proposition that judicial review of a PSRB order leaves the reviewing court free to diagnose or rediagnose. However that may be, on remand the PSRB may and should determine whether an "organic personality disorder" caused by the birth defect of cerebral palsy is a separate entity from a "personality disorder" of the same etiology.

---

[3] All briefs of both parties in this case refer to the diagnosis testimony at petitioner's November 1993 hearing as "organic personality *disorder*."