# IN THE SUPREME COURT OF CALIFORNIA

In re N.R., a Person Coming Under the Juvenile Court Law.

---

LOS ANGELES COUNTY DEPARTMENT OF CHILDREN
AND FAMILY SERVICES,
Plaintiff and Respondent,
v.
O.R.,
Defendant and Appellant.

S274943

Second Appellate District, Division Five
B312001

Los Angeles County Superior Court
20CCJP06523A

---

December 14, 2023

Chief Justice Guerrero authored the opinion of the Court, in which Justices Corrigan, Liu, Kruger, Groban, Jenkins, and Evans concurred.

---

In re N.R.

S274943


Opinion of the Court by Guerrero, C. J.


We granted review in this matter to decide two related issues associated with the exercise of dependency jurisdiction by the juvenile court.

The first issue concerns the meaning of "substance abuse" as used within Welfare and Institutions Code section 300, subdivision (b)(1)(D) (hereinafter section 300(b)(1)(D)).[1] The statutory scheme for dependency proceedings provides that jurisdiction over a child exists in various scenarios in which the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness." (§ 300, subd. (b)(1).) These circumstances include situations in which serious physical harm or illness, or a substantial risk of serious physical harm or illness, results from an "inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." (§ 300(b)(1)(D).) We must decide here whether substance abuse, in this context, requires either a diagnosis by a medical professional or satisfaction of the prevailing criteria for a substance use disorder as specified within the Diagnostic and Statistical Manual of Mental

---

[1] All subsequent undesignated statutory references are to the Welfare and Institutions Code.

1

Disorders (DSM), a text developed by the American Psychiatric Association.

As to this issue, we hold that neither of these showings is essential under section 300(b)(1)(D). We interpret section 300(b)(1)(D) as assigning the term "substance abuse" its ordinary meaning — essentially, the excessive use of drugs or alcohol. Although a professional diagnosis or satisfaction of the DSM criteria for the pertinent substance use disorder can be relevant to ascertaining the existence of substance abuse under this standard, we do not read the statute as requiring such proof.

We caution, however, that for dependency jurisdiction to exist due to substance abuse pursuant to section 300(b)(1)(D), this abuse must render a parent or guardian unable to provide regular care for a child and either cause the child to suffer serious physical harm or illness or place the child at substantial risk of suffering such harm or illness. These additional requirements function to limit the circumstances in which a parent's or guardian's substance abuse will support the exercise of dependency jurisdiction under this provision.

The second issue before us relates to how these additional requirements may be established. Some courts have held that the existence of substance abuse by a parent or guardian, by itself, amounts to prima facie evidence of both an inability to provide regular care for a child and a substantial risk of serious physical harm when the child is of "tender years," a term that is sometimes used by courts to describe young children with limited ability to care for themselves. We reject this tender years presumption as inconsistent with the Legislature's intent, as manifested in the statutory text. The age of a child may bear

upon whether substance abuse renders a parent or guardian unable to provide that child with regular care, and whether the child is thereby placed at substantial risk of serious physical harm or illness. But the statutory scheme does not allow courts to treat a showing of substance abuse as always being sufficient on its own to establish these other requirements for dependency jurisdiction under section 300(b)(1)(D), even when a young child is involved.

Consistent with these conclusions, we reverse the judgment below and remand this matter to the Court of Appeal for further proceedings consistent with our opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On November 19, 2020, police officers executed a search warrant at the residence of N.R.'s mother, S.H. (Mother).[2] N.R. was 12 months old at the time. Mother lived separately from N.R.'s father, appellant O.R. (Father), with the two parents sharing custody of N.R.

During the execution of the search warrant, a social worker employed by the Los Angeles County Department of Children and Family Services (the Department) spoke with Mother and inspected the premises. The social worker had safety concerns regarding N.R.'s living arrangements and asked Mother if N.R. could stay with Father while the investigation continued. Mother agreed to contact Father, who soon arrived to pick up N.R.

The social worker accompanied Father to his apartment and toured it with him. The social worker's assessment of

---

[2] The search was directed toward weapons and drugs believed to be in the possession of Mother's brother and her mother's boyfriend.

Father's residence was generally positive. N.R. was observed to be "clean, neat and on target with all developmental milestones." In speaking with the social worker, Father denied that he abused substances, and he agreed to take a drug test.

Father's drug test, conducted that same day, came back positive for cocaine metabolite at a measured level of 1441 nanograms per milliliter. The social worker went to Father's apartment to discuss the results with him. Father said he had been scared to reveal his cocaine use in their earlier conversation. He admitted he had used cocaine the weekend before the positive test. He said he did not know how much of the substance he had used. Father denied that he was an active user of cocaine. He explained that he used the cocaine to celebrate his birthday and had not expected he would be asked to take care of N.R. soon thereafter, and that he had not used drugs since then.

N.R. remained in Father's care, with no concerns beyond those described above being noted by social workers, from November 19, 2020, until the execution of a removal order on December 8, 2020. Pursuant to this order, N.R. was placed in the care of a maternal uncle.

Shortly thereafter, a petition was filed in Los Angeles County Superior Court alleging that N.R. came within the dependency jurisdiction of the juvenile court. Tracking language appearing within section 300, subdivision (b)(1), the petition alleged that N.R. had suffered, or there was a substantial risk he would suffer, serious physical harm or illness "as a result of the failure or inability of his . . . parent or legal guardian to supervise or protect [him] adequately," "as a result of the willful or negligent failure of [his] parent or legal guardian to supervise or protect [him] adequately from the conduct of the

custodian with whom [he] has been left," and "by the inability of the parent or legal guardian to provide regular care for [him] due to the parent's or legal guardian's mental illness, developmental disability, or substance abuse."

The factual allegations in the petition alleged, first, that Mother had created a dangerous home environment by allowing her mother (N.R.'s maternal grandmother), who allegedly abused drugs, to reside with Mother and N.R. According to the petition, Father failed to protect N.R. from this danger even though he knew or should have known of the grandmother's substance abuse. As a separate factual basis for the assertion of dependency jurisdiction, the petition alleged that Father "has a history of substance abuse and is a current abuser of cocaine," noting Father's positive toxicology result. According to the petition, N.R. was "of such a young age as to require constant care and supervision and father's substance abuse interferes with providing regular care" for him. The petition further alleged that Mother had failed to protect N.R. from what it characterized as Father's substance abuse.

Both parents subsequently spoke to Department staff regarding Father's drug use. Mother initially said that although she had not known that Father used drugs, looking back, she realized that Father had been using cocaine from before N.R. was born until recently. In a later interview, however, she said that Father used cocaine only before N.R. was born. As for Father, he explained that he had celebrated his birthday by using cocaine from Thursday, November 12, through Sunday, November 15. He stated, "All 4 days I used [cocaine]. Maybe it was a big amount throughout the 4 days, that's why it came out positive." Asked how much cocaine he used, he said he and his "friends would pitch in 10 dollars each to get something small

and that's it. I don't know how much we got. I had alcohol too all 4 days, maybe just 2 tall cans a day." Father, who was 26 years old at the time of the interview, said he was 21 or 22 when he first tried cocaine. He elaborated, "I never had a problem with it, I never bought it myself, all these friends did it together. I used to rave a lot, and when there were big parties, I'd do it with my friends." Father said that he used cocaine "once or twice every two weeks," adding, "I don't have an addiction, otherwise I'd be broke."

According to Father, N.R. had overnight visits with him on weekends, and both parents were working well on co-parenting. Father said that he did not take care of N.R. when high, and he would not "party" when N.R. was at his residence. As for the positive test result, Father said, "I'm so upset that they caught me! My mom was upset too. She was crying when I told her I tested positive. This cocaine thing is not me! I'm so upset!" Father said that he formerly smoked marijuana, but no longer did so. He also reported that he began to drink alcohol at age 16, but said, "It was never serious, never out of control. I still go to work and school."[3]

A social worker explained to Father what a Child and Family Team was, as well as its potential benefits.[4] Father said

---

[3] Father had a barber's license. He had been working at a barber shop for approximately 20 hours per week until the COVID-19 pandemic struck, at which time he began working part-time at a warehouse. He lived with his mother and older brother, and had no criminal record.

[4] A Child and Family Team is "a group of individuals who are convened by the placing agency and who are engaged through a variety of team-based processes to identify the strengths and needs of the child or youth and their family, and

that he did not want to participate in the program, explaining, "I just want the drug testing. It's too much. It's already a big deal I have two kids. I just want it over with."[5] Regarding this testing, between January and March 2021 Father had three negative drug tests, two missed tests, and one leaked test. After the first missed test, Father contacted a social worker to explain that he had missed the test due to his work schedule. He asked that the drug tests occur on Mondays and Fridays, a request that was denied. The other missed test, on February 23, 2021, was on a Tuesday.

A combined jurisdiction and disposition hearing occurred in April 2021. After hearing argument from counsel, the court dismissed the factual allegations involving conditions at Mother's former residence[6] but concluded that Father's "substantial drug abuse history" warranted findings that N.R. came within the court's dependency jurisdiction and should be removed from Father's care and custody. The court interlineated the dependency petition's factual allegations to describe Father as a "recent abuser of cocaine," rather than a "current" one. N.R. was ordered home with Mother on the condition that she continue to comply with conditions specified by the court. Father was given monitored visitation and ordered to participate in drug- and alcohol-related services, including random drug testing.

---

to help achieve positive outcomes for safety, permanency, and well-being." (§ 16501, subd. (a)(4).)

[5] Father had another child from a different relationship.

[6] Mother had moved into her own apartment by the time of the hearing.

Father appealed. In his briefing before the Court of Appeal, Father admitted that he had used cocaine, but he argued that this use did not amount to substance abuse that supported a jurisdictional finding. Identifying a split of authority across the Courts of Appeal regarding the meaning of "substance abuse" as it appears in section 300, subdivision (b), Father urged the court to adopt the interpretation first articulated by *In re Drake M.* (2012) 211 Cal.App.4th 754 (*Drake M.*), disapproved on another ground in *In re D.P.* (2023) 14 Cal.5th 266, 283. *Drake M.*, after observing that "[d]ependency cases have varied widely in the kinds of parental actions labeled 'substance abuse,'" concluded that "a workable definition is necessary to avoid any resulting inconsistencies." (*Drake M.*, at p. 765.) The court then opined "that a finding of substance abuse for purposes of section 300, subdivision (b), must be based on evidence sufficient to (1) show that the parent or guardian at issue had been diagnosed as having a current substance abuse problem by a medical professional or (2) establish that the parent or guardian at issue has a current substance abuse problem as defined in the" current version of the DSM at the time of that decision. (*Id.* at p. 766.)[7]

*Drake M.* also concluded that a finding of substance abuse under this standard constituted "prima facie evidence of the inability of a parent or guardian to provide regular care resulting in a substantial risk of physical harm" to a child of "'tender years.'" (*Drake M.*, *supra*, 211 Cal.App.4th at p. 767.)

---

[7] At the time the *Drake M.* decision was rendered in 2012, section 300, subdivision (b) had not yet been parsed into its current subdivisions. (See Stats. 2022, ch. 832, § 1; Stats. 2014, ch. 29, § 64.)

Father's briefing before the Court of Appeal criticized this aspect of *Drake M.*, observing that the statutory scheme nowhere on its face treats sufficient proof of substance abuse as prima facie evidence of an inability to provide regular care or a substantial risk of physical harm. In any event, Father argued, the evidence before the juvenile court rebutted any prima facie case that might have arisen.

The Court of Appeal affirmed. The court determined, first, that "[s]ubstantial evidence supports the juvenile court's exercise of jurisdiction over very young N.R. because of Father's abuse of cocaine." In so holding, the Court of Appeal did not discuss the split of authority regarding the meaning of the term "substance abuse." In upholding the juvenile court's assertion of jurisdiction, the court noted Father's initial denial of drug use, the high level of cocaine metabolites recorded in his positive test result, and his admission to using cocaine once or twice every two weeks over a four- or five-year period, concluding therefrom that the record contained substantial evidence of substance abuse.

The Court of Appeal recognized that a "section 300, subdivision (b)(1) finding 'cannot be based on substance abuse alone; jurisdiction [also] requires a substantial risk of harm to the child arising from the substance abuse.' " But the court then invoked the tender years presumption, observing that "[w]here very young children like N.R. are concerned . . . ' "the finding of substance abuse is prima facie evidence of the inability of a parent or guardian to provide regular care resulting in a substantial risk of physical harm." ' " The Court of Appeal determined that Father had not rebutted the prima facie showing of a substantial risk of serious physical harm established by his substance abuse, perceiving Father's reaction

to the positive drug test and his refusal to participate in services beyond random drug testing as further evidence of such risk.

Turning to the juvenile court's disposition order, the Court of Appeal determined that this order was supported by substantial evidence establishing "both that N.R. would be at substantial danger if returned to Father's unsupervised care and there were no reasonable means short of removal to mitigate the danger to N.R." The court found that Father's "behavior — especially his initial effort to conceal his drug use and his steadfast denial that his drug use was a problem — demonstrate he was unable or unwilling to substantively engage with any efforts that might have prevented the need to remove N.R. from his custody so as to mitigate the substantial danger to the very young child from Father's cocaine abuse."

We granted review to resolve the split of authority regarding the meaning of "substance abuse" as used in section 300(b)(1)(D). Some Courts of Appeal have adopted the definition crafted in *Drake M.* (see, e.g., *In re L.C.* (2019) 38 Cal.App.5th 646, 652; *In re Alexzander C.* (2017) 18 Cal.App.5th 438, 447, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7), whereas others (see, e.g., *In re K.B.* (2021) 59 Cal.App.5th 593, 601) have followed *In re Christopher R.* (2014) 225 Cal.App.4th 1210 (*Christopher R.*), in which the court "recognize[d] the *Drake M.* formulation as a generally useful and workable definition of substance abuse for purposes of section 300, subdivision (b)," but refused to accept the argument that substance abuse can be found only when someone "has been diagnosed by a medical professional or . . . falls within one of the specific [DSM] categories." (*Christopher R.*, at p. 1218.) In ordering review, we also agreed to decide whether substance abuse by a parent or guardian, when found

to exist, should be treated as prima facie evidence of an inability to provide regular care and a substantial risk of serious physical harm to a young child. This aspect of the *Drake M.* decision has found acceptance even among courts that have rejected its view that substance abuse requires a professional diagnosis or satisfaction of the relevant DSM criteria. (See, e.g., *Christopher R.*, at p. 1219.)

## II. DISCUSSION

Both issues before us present questions of statutory interpretation. After reviewing the juvenile dependency scheme, we consider whether the Legislature intended for substance abuse to be recognized only upon evidence establishing either that the pertinent DSM criteria have been satisfied or that a parent or guardian has been diagnosed with a substance use disorder by a qualified professional. We then address whether a finding of substance abuse is properly regarded as prima facie evidence of an inability to provide regular care to a young child and a substantial risk of serious physical harm to that child.

### A. The Statutory Scheme for Dependency Proceedings

"The purpose of California's dependency law is 'to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm.' (Welf. & Inst. Code, § 300.2, subd. (a).) In its effort to achieve this overarching goal, the law balances a number of vital interests: children's interests in safe and stable homes; parents' interests in raising their children;

families' shared interests in each other's companionship; and the state's interest in protecting society's most vulnerable members." (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 623–624 (*Michael G.*).)

"Dependency proceedings span up to four stages: jurisdiction, disposition, reunification, and permanency. [Citations.] At the jurisdictional stage, the juvenile court determines whether to declare a child a dependent of the court because the child is suffering, or at risk of suffering, significant harm." (*Michael G., supra*, 14 Cal.5th at p. 624.) " 'A dependency adjudication is a preliminary step that allows the juvenile court, within specified limits, to assert supervision over the endangered child's care.' [Citation.] After the juvenile court takes that preliminary step, the court may impose limitations on parental authority as necessary to protect the child. [Citations.] It may also order that the child be removed from a parent's physical custody if there is clear and convincing evidence that removal is necessary to protect the child from a substantial risk of harm. [Citations.] In some cases, a dependency adjudication may lead to termination of parental rights." (*In re I.C.* (2018) 4 Cal.5th 869, 876 (*I.C.*).)

Section 300 enumerates the various ways in which a child may come within the dependency jurisdiction of the juvenile court. Our focus here is upon section 300, subdivision (b)(1), which provides that a juvenile may be adjudged a dependent of the court when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of any of the following: [¶] (A) The failure or inability of the child's parent or guardian to adequately supervise or protect the child. [¶] (B) The willful or negligent failure of the child's parent or guardian to adequately supervise

or protect the child from the conduct of the custodian with whom the child has been left. [¶] (C) The willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment. [¶] (D) The inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, *or substance abuse*." (Italics added.) Although we have previously considered other aspects of section 300 (see, e.g., *I.C.*, *supra*, 4 Cal.5th 869; *In re R.T.* (2017) 3 Cal.5th 622 (*R.T.*); *In re I.J.* (2013) 56 Cal.4th 766 (*I.J.*)), we have not previously interpreted the statute's reference to substance abuse.

## B. Neither Satisfaction of the Relevant DSM Criteria nor a Professional Medical Diagnosis Is Required To Show Substance Abuse Under Section 300

The first issue we address is whether a juvenile court may recognize substance abuse by a parent or guardian under section 300(b)(1)(D) only in circumstances in which the evidence before it either (1) establishes that the relevant diagnostic criteria in the current edition of the DSM have been satisfied, as Father has argued before us, or (2) includes a professional diagnosis of a current substance use disorder, which the *Drake M.* court also contemplated as an alternative method of proving the existence of substance abuse. We conclude that the Legislature did not impose either requirement when it added the substance abuse language to section 300 in 1987 as part of a broader overhaul of the dependency scheme.

### 1. *Statutory Language*

" ' "When we interpret a statute, '[o]ur fundamental task . . . is to determine the Legislature's intent so as to

effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.' [Citation.] 'Furthermore, we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose.' " ' " (*Meza v. Portfolio Recovery Associates, LLC* (2019) 6 Cal.5th 844, 856–857 (*Meza*).)

> a. *Applying standard principles of statutory interpretation, "substance abuse" bears its ordinary meaning here*

Beginning with the statutory text, we observe that neither section 300 nor any other provision within the statutory scheme relating to dependency proceedings defines "substance abuse," although definitions are provided for other terms relevant to the exercise of dependency jurisdiction. (E.g., § 300, subds. (b)(4) [defining "sexually trafficked" by reference to the definition provided in Pen. Code, § 236.1 and "sexual acts" by reference to Pen. Code, §§ 236.1 and 11165.1], (d) [explaining that the statute borrows the definition of "sexual abuse" found in Pen. Code, § 11165.1], (e) [defining "severe physical abuse"].)

The Legislature's failure to define substance abuse suggests that legislators intended for this term to bear its ordinary meaning in this context. (See *Valley Circle Estates v. VTN Consolidated, Inc.* (1983) 33 Cal.3d 604, 608–609 [" 'Excepting when clearly otherwise intended or indicated, words in a statute should be given their ordinary meaning and receive a sensible construction in accord with the commonly understood meaning thereof' "]; *County of Orange v. Santa Margarita Water Dist.* (1996) 44 Cal.App.4th 189, 192 ["When a statute does not define its operative words, 'courts should give to the words . . . their ordinary, everyday meaning' "]; cf. *People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 302 (*Lungren*) [noting of text in an initiative statute that "because the term is not further defined, it can be assumed to refer not to any special term of art, but rather to a meaning that would be commonly understood by the electorate"].)[8]

In this respect, dictionaries can provide a helpful resource for ascertaining the common meanings attached to a word or phrase. (See *People v. Leal* (2004) 33 Cal.4th 999, 1009.) The definitions of "substance abuse" appearing within dictionaries vary to some degree in their specificity and particulars. (See, e.g., Merriam-Webster's Collegiate Dict. (10th ed. 2000) p. 1170, col. 2 [defining "substance abuse" as "excessive use of a drug (as

_____

[8] The Legislature has defined "substance abuse" as it appears in a different provision of the Welfare and Institutions Code. Section 746, subdivision (b) identifies "substance abuse" as among the factors that place a "minor at a significantly greater risk of becoming a chronic juvenile or adult offender," and defines "substance abuse" in that context as including "any regular use of alcohol or drugs by the minor, other than experimentation." (*Id.*, subd. (b)(3).)

alcohol, narcotics, or cocaine): use of a drug without medical justification"]; American Heritage Dict. of the English Language (3d ed. 1996) p. 1791, col. 2 [defining "substance abuse" as "Excessive use of addictive substances, especially alcohol and narcotic drugs"]; The Random House Dict. of the English Language (2d ed. 1987) p. 1897, col. 1 [defining "substance abuse" as "long-term, pathological use of alcohol or drugs, characterized by daily intoxication, inability to reduce consumption, and impairment in social or occupational functioning; broadly, alcohol or drug addiction"].) These definitions are alike, however, in that they all associate substance abuse with the excessive use of drugs or alcohol. We conclude that "substance abuse," as it appears in section 300(b)(1)(D), is most plausibly understood as bearing this ordinary meaning. (See *Bernard v. Foley* (2006) 39 Cal.4th 794, 808 [perceiving no indication within a statute "that would justify our presuming the Legislature intended a specialized or narrow usage rather than a general one"].)

While this commonplace understanding of substance abuse may seem broad and potentially capable of inconsistent application if read in isolation, nearby language within the statute clarifies the kind of excessive drug or alcohol use that section 300(b)(1)(D) is concerned with and limits the circumstances in which substance abuse will allow for a jurisdictional finding under this provision. Section 300(b)(1)(D) allows for dependency jurisdiction based on substance abuse only when this abuse leads to an "inability" on the part of a parent or guardian "to provide regular care for [a] child" (§ 300(b)(1)(D)) that causes the child to suffer, or creates "a substantial risk that the child will suffer, serious physical harm or illness" (*id.*, subd. (b)(1)). Even if a parent's or guardian's

excessive use of drugs or alcohol has other negative manifestations, it does not provide a basis for jurisdiction under section 300(b)(1)(D) unless it also has these effects. (*Ibid*.)[9]

        b. *The statutory scheme does not support defendant's argument that the Legislature assigned substance abuse a technical meaning linked to the DSM*

Father reads the statutory text differently, but his interpretation is unpersuasive.

Father asserts that "substance abuse," as used in section 300(b)(1)(D), "is best understood by consulting the dictionary of brain disorders: the DSM." In essence, he contends that section 300(b)(1)(D) uses "substance abuse" in a technical sense that makes it appropriate to consult the DSM as an authoritative text in its field. (See *In re Smith* (1928) 88 Cal.App. 464, 467–468 ["Technical words when relating to a trade, when used in a statute or ordinance, dealing with the subject matter of such trade, are to be taken in their technical sense and will be so construed unless the context or other considerations show a contrary intent"]; *Mueller v. Psychiatric Security Review Bd.* (Or. 1997) 937 P.2d 1028, 1032 ["Because the phrase

---

[9] In certain circumstances a parent's or guardian's substance-related issues may contribute to a finding that dependency jurisdiction exists for another reason, such as a "failure or inability of the child's parent or guardian to adequately supervise or protect the child." (§ 300, subd. (b)(1)(A).) Although this case does not require that we construe section 300, subdivision (b)(1)(A), this provision serves to show that an exercise of dependency jurisdiction that is in some measure premised on a parent's or guardian's involvement with drugs or alcohol does not necessarily require a judicial finding of substance abuse under some defined standard.

'personality disorder' [under Oregon statutory law] is a term of art as to which the DSM-III was the definitive source, this court has referred to the DSM for guidance in cases involving individuals with mental diseases or defects"].)

Some background information regarding the DSM is helpful in evaluating Father's argument. The DSM, now in its fifth revised edition (DSM-5-TR),[10] "is a classification of mental disorders that was developed for use in clinical, educational, and research settings" (DSM-5-TR, *supra*, at p. 23). The "primary purpose" of the DSM "is to assist trained clinicians in the diagnosis of mental disorders as part of a case formulation assessment that leads to an informed treatment plan for each individual." (*Id.* at p. 21.)

The DSM-5-TR and prior editions of the DSM (including the DSM-III and the DSM-III-R, which were the most recent versions of the manual when the substance abuse language was

---

**10** This version of the DSM was published in 2022. (Am. Psychiatric Assn., Diagnostic and Statistical Manual of Mental Disorders (5th ed. text rev. 2022).) The DSM was first published in 1952. (Am. Psychiatric Assn., Diagnostic and Statistical Manual of Mental Disorders (1952).) A second edition was published in 1968 (Am. Psychiatric Assn., Diagnostic and Statistical Manual of Mental Disorders (2d ed. 1968)); a third edition in 1980 (Am. Psychiatric Assn., Diagnostic and Statistical Manual of Mental Disorders (3d ed. 1980) (DSM-III)); a third revised edition in 1987 (Am. Psychiatric Assn., Diagnostic and Statistical Manual of Mental Disorders (3d rev. ed. 1987) (DSM-III-R)); a fourth edition in 1994 (Am. Psychiatric Assn., Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994) (DSM-IV)); a fourth revised edition in 2000 (Am. Psychiatric Assn., Diagnostic and Statistical Manual of Mental Disorders (4th ed. text rev. 2000) (DSM-IV-TR)); and a fifth edition in 2013 (Am. Psychiatric Assn., Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (DSM-5)).

added to § 300) have identified an array of disorders involving substance use and, beginning with the DSM-III, have included criteria for diagnosing these disorders. The categorization and specific descriptions of these disorders have evolved over time. The DSM-III-R distinguished between "Psychoactive Substance Dependence" (involving the satisfaction of at least three of nine specified criteria) (DSM-III-R, *supra*, at p. 166) and a "residual" disorder, "Psychoactive Substance Abuse," which would be diagnosed only if the criteria for substance dependence were not satisfied (*id*. at p. 169). (See *id*. at pp. 165–169; see also DSM-III, *supra*, at pp. 164–165 [distinguishing between "substance abuse" and "substance dependence," with the latter being "generally . . . a more severe form of Substance Use Disorder"].) Within the DSM-5-TR, the previously recognized categories of substance abuse and substance dependence have been replaced "with an overarching new category of substance use disorders — with the specific substance used defining the specific disorders." (DSM-5-TR, *supra*, at p. xxiv.)[11]

According to the DSM-5-TR, which Father identifies as supplying the operative criteria at this time for ascertaining substance abuse under section 300(b)(1)(D), "The essential feature of a substance use disorder is a cluster of cognitive, behavioral, and physiological symptoms indicating that the individual continues using the substance despite significant substance-related problems." (DSM-5-TR, *supra*, at p. 544.) Within the array of substance use disorders described by the

---

[11] Notwithstanding the DSM's revision of its terminology for substance use disorders, we primarily use the term "substance abuse" within this opinion to remain consistent with the language used in section 300(b)(1)(D).

DSM-5-TR, stimulant use disorders are characterized as "[a] pattern of amphetamine-type substance, cocaine, or other stimulant use leading to clinically significant impairment or distress, as manifested by at least two" of 11 identified criteria over a 12-month period. (*Id.* at p. 632.)[12]

Upon review of both the statutory text and the DSM, it does not appear that the Legislature intended for the term "substance abuse," as used in section 300(b)(1)(D), to bear the technical meaning that Father ascribes to it. Neither section 300 nor any other provision within the statutory scheme

---

[12] The DSM-5-TR criteria for a stimulant use disorder consist of the following: "The stimulant is often taken in larger amounts or over a longer period than was intended"; "There is a persistent desire or unsuccessful efforts to cut down or control stimulant use"; "A great deal of time is spent in activities necessary to obtain the stimulant, use the stimulant, or recover from its effects"; "Craving, or a strong desire or urge to use the stimulant"; "Recurring stimulant use resulting in a failure to fulfill major role obligations at work, school, or home"; "Continued stimulant use despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of the stimulant"; "Important social, occupational, or recreational activities are given up or reduced because of stimulant use"; "Recurrent stimulant use in situations in which it is physically hazardous"; "Stimulant use is continued despite knowledge of having a persistent or recurrent physical or psychological problem that is likely to have been caused or exacerbated by the stimulant"; "Tolerance, as defined by either . . . : [¶] a. A need for markedly increased amounts of the stimulant to achieve intoxication or desired effect. [¶] b. A markedly diminished effect with continued use of the same amount of the stimulant"; and "Withdrawal, as manifested by either . . . : [¶] a. The characteristic withdrawal syndrome for the stimulant . . . . [¶] b. The stimulant (or a closely related substance) is taken to relieve or avoid withdrawal symptoms." (DSM-5-TR, *supra,* at pp. 632–633.)

mentions the DSM. The absence of any such references counsels against Father's position. It would be unusual for the Legislature to have delegated to a specific body such as the American Psychiatric Association the authority to define such a consequential term appearing in a statute. Had the Legislature placed such reliance upon a text developed and maintained by a nongovernmental entity, which could change its terminology or redefine the relevant criteria in a manner wholly outside of the Legislature's control (see *Conservatorship of Roulet* (1979) 23 Cal.3d 219, 234, fn. 14 [observing that "the American Psychiatric Association frequently alters its definitions of what constitutes a mental disorder"]), one would expect to see some acknowledgement of that delegation on the face of the statute. (See, e.g., Cal. Code Regs., tit. 9, former § 813 [specifying that the term "mental disorder," as formerly used within the Lanterman-Petris-Short Act (§ 5000 et seq.), was "limited to those disorders listed by the American Psychiatric Association in its Diagnostic and Statistical Manual of Mental Disorders"]; cf. Pub. Resources Code, § 48620.2, subd. (a)(2) [referencing an American Society for Testing and Materials (ASTM) standard within a definition].) Yet no such explanation appears here, suggesting that the Legislature did not intend for the meaning of "substance abuse" to hinge entirely upon the criteria articulated in the DSM.

Nor can we infer, based on usage at the time of section 300(b)(1)(D)'s enactment, that the Legislature regarded the term "substance abuse" as so obviously referring to the pertinent DSM criteria as to make any explanation unnecessary. To the contrary, contemporaneously enacted statutes commonly assigned the term "substance abuse" a more conventional, nontechnical meaning. (See, e.g., Stats. 1987, ch. 1291, § 1,

p. 4618, adding Ed. Code, § 44049, subd. (b) [conferring limited immunity upon school principals and their designees who inform parents of instances in which a pupil engaged in "alcohol or controlled substance abuse"]; Stats. 1987, ch. 879, § 1, p. 2778, adding Pen. Code, § 1203.1ab [providing for "drug and substance abuse testing" of certain probationers]; Stats. 1986, ch. 1441, § 1, p. 5146, adding Welf. & Inst. Code, § 502, subd. (a)(4) [referencing "crimes of . . . substance abuse"].)

It is notable too that the Legislature departed from the classification scheme and terminology that the DSM-III and the DSM-III-R applied to substance use disorders. These departures also suggest that legislators did not intend to limit findings of substance abuse to situations in which the pertinent DSM criteria had been satisfied. Section 300(b)(1)(D) avoids the distinction that the DSM-III and DSM-III-R drew between "Substance Dependence" and "Substance Abuse." (DSM-III-R, *supra*, at pp. 166, 169; DSM-III, *supra*, at pp. 164–165.) In doing so, the statute does not explain whether the condition described as substance dependence in those editions of the DSM should be regarded as substance abuse for purposes of applying the statute. Section 300(b)(1)(D) also departs from the DSM's approach insofar as the statute distinguishes between "substance abuse" and "mental illness" (itself a term the DSM has long rejected, in favor of "mental disorder"), rather than treating the former as a subset of the latter. Had the Legislature intended for the prevailing DSM criteria to provide the sole reference point for recognizing substance abuse by a parent or guardian, section 300 presumably would have reconciled or at least acknowledged these differences in terminology and categorization.

We therefore do not perceive in the language of section 300 any persuasive indication that the Legislature intended for the relevant DSM criteria to supply the exclusive definition of substance abuse. This conclusion is not altered by section 300(b)(1)(D)'s grouping of substance abuse together with "mental illness" and "developmental disability." Father asserts that the Legislature would have perceived all three of these circumstances as capable of being shown only through the satisfaction of professionally developed criteria. His position relies upon the *noscitur a sociis* canon of statutory construction, whereby " ' "[a] word of uncertain meaning may be known from its associates and its meaning 'enlarged or restrained by reference to the object of the whole clause in which it is used.' " ' " (*People v. Hernandez* (2017) 10 Cal.App.5th 192, 200 (*Hernandez*).)

When applicable, the *noscitur a sociis* canon favors " ' " 'a restrictive meaning of a listed item if acceptance of a more expansive meaning would make other items in the list unnecessary or redundant, or would otherwise make the item *markedly dissimilar* to the other items in the list.' " ' " (*Hernandez, supra,* 10 Cal.App.5th at p. 200, italics added.) There are some threshold hurdles to the application of this principle here. It is not clear that section 300(b)(1)(D)'s recitation of "mental illness, developmental disability, or substance abuse" implicates this canon at all. (See *American Bankers v. National Credit Union Admin.* (D.C. Cir. 2019) 934 F.3d 649, 665 [terms in a list found within a statute may be treated differently when their " 'fit' " is neither tight nor self-evident].) Moreover, the case law casts doubt on the premise, essential to Father's argument, that satisfaction of a specific professionally developed standard analogous to the DSM

23

criteria for substance use disorders is required to show a mental illness or developmental disability in the dependency context. (See *Laurie S. v. Superior Court* (1994) 26 Cal.App.4th 195, 202 (*Laurie S.*) [finding expert testimony unnecessary to assess, at the jurisdictional stage of dependency proceedings, whether a parent's mental health issues placed her child at substantial risk of serious physical harm]; *In re Khalid H.* (1992) 6 Cal.App.4th 733, 736 (*Khalid H.*) [noting that section 300, subdivision (b)(1) "does not contain a described formal procedure to determine if a parent suffers from a mental illness," and declining to read such a procedure into the statute].)

But Father's argument would fail even if we were to regard the *noscitur a sociis* canon as relevant and further assume for sake of argument that the Legislature intended for findings of mental illness and developmental disability under section 300(b)(1)(D) to require the satisfaction of objective criteria commonly relied upon by professionals in the relevant fields. It would not make mental illness and developmental disability on the one hand, and substance abuse on the other, " ' " 'markedly dissimilar' " ' " (*Hernandez, supra*, 10 Cal.App.5th at p. 200) if the same kind of showing were not strictly necessary to establish substance abuse. The Legislature could well have grouped mental illness, developmental disability, and substance abuse together as circumstances that all may lead to an inability to provide a child with regular care, while at the same time appreciating that each could involve somewhat different kinds of proof. (See *Lungren, supra*, 14 Cal.4th at p. 308 [rejecting an invocation of the *noscitur a sociis* principle because when viewed in light of the relevant statute's broader purpose, "the seeming dissimilarities between"

two subjects of legislation "become less significant than their similarities"].)

In short, the mere fact that the terms "mental illness," "developmental disability," and "substance abuse" are in close proximity to one another within section 300(b)(1)(D) does not establish that the Legislature intended that similar showings would be required to prove them.

Father also argues that references to substance abuse treatment programs (§§ 300.2, subd. (a), 361.5, subd. (a)(3)(A)) and substance abuse treatment facilities (e.g., §§ 366.21, subd. (e)(1), 366.22, subd. (a)(1)) appearing elsewhere within the statutory scheme connote a focus upon substance use severe enough to require treatment, and that the DSM criteria provide the appropriate framework for determining whether substance abuse exists under this standard.

This argument reads too much into these provisions, which concern the significance to be accorded at different stages of the dependency process to a parent's or guardian's enrollment in a substance abuse treatment or facility (e.g., §§ 361.5, subd. (a)(3)(A), 366.21, subd. (e)(1), 366.22, subd. (a)(1)) or to the successful completion of, or failure to complete, a substance abuse treatment program (e.g., § 300.2, subd. (a); § 364, subd. (c) [referring to a "court ordered treatment program"]). These scattered references to treatment in varied contexts do not establish that the Legislature regarded substance abuse as present under section 300(b)(1)(D) only when the relevant DSM criteria for a substance use disorder have been satisfied. The Legislature could have recognized the existence of substance abuse treatment programs and facilities, and further sought to explain the relationship between enrollment in a program or

facility and decisions that must be made at different stages of the dependency process, without also perceiving the close connections among substance abuse, treatment, and the DSM that Father advances in his interpretation of section 300(b)(1)(D). Indeed, as we have explained, the weight of evidence of legislative intent that can be gleaned from the statutory text indicates that these connections were *not* intended. Instead, the term "substance abuse" carries its ordinary meaning as used in section 300(b)(1)(D), with other language within the statute harmonizing this definition with the overarching goals of the dependency scheme by clarifying that, to supply grounds for dependency jurisdiction, substance abuse must make the parent or guardian unable to provide regular care for a child and lead to serious physical harm to the child, or a substantial risk of such harm.

2. *Legislative History*

Although the lack of textual support for Father's position is compelling, we also consider Father's argument that his interpretation of section 300(b)(1)(D) is grounded in the legislative history of, and purposes behind, the dependency scheme. We conclude this contention is no more persuasive than Father's textual arguments.

The legislative history materials surrounding the 1987 amendments to the dependency scheme do not mention the DSM at all. The absence of any such discussion provides a persuasive indication that the Legislature did not intend to restrict judicial findings of substance abuse to circumstances in which the DSM criteria have been satisfied. (See, e.g., *Larkin v. Workers' Comp. Appeals Bd.* (2015) 62 Cal.4th 152, 166 [assigning significance to the absence of discussion of an issue within legislative history

materials]; *Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1169 [same].)

Father nonetheless argues that linking findings of substance abuse to the prevailing DSM criteria for substance use disorders would advance the enacting Legislature's goals of clarifying the grounds for dependency jurisdiction (see *R.T.*, *supra*, 3 Cal.5th at p. 631) and distinguishing between substance *use* and substance *abuse*. Our review of the pertinent legislative history materials, set out below, corroborates Father's understanding that the Legislature had these general aims in mind when it added the substance abuse language to section 300 in 1987. But we do not believe the Legislature implemented these goals by defining substance abuse in the manner Father proposes.

As background, the legislation that added the substance abuse language to section 300 (Sen. Bill No. 243 (1987–1988 Reg. Sess.) (Senate Bill No. 243)) was developed by a task force that had been charged by statute with reviewing the laws relating to child abuse reporting, dependent children, and child welfare services, and had been directed to "identify problem areas in the law" and recommend "statutory revisions to strengthen and compliment the child welfare system in California." (Stats. 1986, ch. 1122, § 24, p. 3995.) Among its findings, the task force determined that section 300, as it existed prior to 1987, provided "very little guidance to investigating and petitioning agencies, to judges, attorneys or to parents as to what actions or harms justify state intervention. Existing law states that a child that comes within any of the following descriptions is within the jurisdiction of the juvenile court: is in need of proper and effective parental care and control; is destitute; is dangerous to the public; [or] lives in a home which

is an unfit place for him or her.  Because there is little legislative guidance, different agencies and individuals employ different standards, and cases are inappropriately brought into the system." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 243 (1987–1988 Reg. Sess.) as amended April 27, 1987, p. 3.)  The Legislature hoped that legislation developed by the task force would "more clearly define the conditions under which a child could be removed from the family home." (*Ibid*.; see also Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 243 (1987–1988 Reg. Sess.) as amended Sept. 10, 1987, p. 1 [describing the proposed legislation as "[c]learly defin[ing] the conditions under which a child can be removed from the family and/or the court can exercise jurisdiction"]; Legis. Analyst, analysis of Sen. Bill No. 243 (1987–1988 Reg. Sess.) as amended May 26, 1987, p. 1 [observing that the measure "[n]arrows the definition of abuse for purposes of dependency proceedings"]; Assem. Com. on Judiciary, Analysis of Sen. Bill No. 243 (1987–1988 Reg. Sess.) as amended Aug. 17, 1987, pp. 1, 3.)

As originally introduced in the Legislature, Senate Bill No. 243 provided for dependency jurisdiction in circumstances such as where "[t]he minor has suffered, or there is a substantial risk that he or she will imminently suffer, physical harm causing disfigurement, impairment of bodily functioning, protracted impairment of physical health, or other serious physical injury, as a result of . . . the inability of the parent or guardian to provide regular care for the minor due to the parent or guardian's *use* of drugs or alcohol or mental illness or deficiency." (Sen. Bill No. 243 (1987–1988 Reg. Sess.) as introduced Jan. 26, 1987, § 6, italics added.)  This language was amended soon after the bill's introduction so that its last clause

described an "inability of the parent, guardian, or primary caretaker to provide regular care for the minor due to the parent's, guardian's, or primary caretaker's mental illness, developmental disability, *or substance abuse.*" (Sen. Bill No. 243 (1987–1988 Reg. Sess.) as amended Mar. 30, 1987, § 6, italics added; see also Sen. Bill No. 1195 Task Force, Minutes (Feb. 19– 20, 1987), p. 1 [recording the task force's approval of this change].) This "substance abuse" terminology was eventually codified. (Stats. 1987, ch. 1485, § 4.5, p. 5606.) Nothing within the legislative history materials before us specifically explains why the original "use of drugs or alcohol" language within the proposed legislation was replaced by the term "substance abuse," or otherwise communicates a prevailing view regarding what the term "substance abuse" meant.

It is apparent from these and other legislative history materials that the Legislature sought to clarify the grounds for assertion of dependency jurisdiction through the revisions to the dependency scheme that were enacted in 1987. But it is also evident that the Legislature implemented its intent in a manner that would "provide maximum protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to protect children who are at risk of that harm," albeit also being mindful not to "disrupt the family unnecessarily or . . . intrude inappropriately into family life." (Former § 300; Stats. 1987, ch. 1485, § 4.5, p. 5608.) Insofar as some bases for dependency jurisdiction could be precisely specified without depriving children of this protection, they were. But as a matter of necessity, some grounds for jurisdiction had to be phrased in more general terms. (See Sen. Bill No. 1195 Task Force, Child Abuse Reporting Laws, Juvenile Court Dependency Statutes, and

Child Welfare Services (Jan. 1988) pp. 4–5 ["The task force spent a great deal of time on the wording of each section and several legislative committees reviewed the specific language in lengthy hearings," and "it is not possible to give a highly specific definition of the phrase 'serious' [as used in § 300] without being too restrictive"].)

For instance, section 300 has since 1987 provided for the exercise of dependency jurisdiction when a child "has been subjected to an act or acts of cruelty by the parent or guardian or a member of the child's household."  (§ 300, subd. (i); see Stats. 1987, ch. 1485, § 4.5, p. 5608.)  The Legislature did not further define "act or acts of cruelty" (§ 300, subd. (i)) due to the myriad forms such conduct may take.  Instead, what constitutes an "act or acts of cruelty" is a "factual determination that the juvenile court makes based upon the common meaning of the phrase and the totality of the child's circumstances."  (*In re D.C.* (2011) 195 Cal.App.4th 1010, 1017.)

On balance, the available evidence of legislative intent indicates the Legislature took a similar approach insofar as substance abuse was concerned, and declined to recognize substance abuse only in situations involving the satisfaction of DSM criteria.  Nor did it otherwise limit the ordinary meaning of substance abuse when these constraints might fail to capture the various ways in which substance abuse can render a parent or guardian unable to provide regular care for a child and place a child at substantial risk of serious physical harm or illness.  Meanwhile, the substitution of "substance abuse" for "use of drugs or alcohol" during the legislative process may have simply reflected an appreciation that, as a practical matter, only the excessive use of drugs or alcohol would lead to an "inability of the parent or guardian to provide regular care for [a] child."

(§ 300(b)(1)(D).) The legislative history therefore does not provide significant support for Father's interpretation of the statute.

### 3. *Statutory Purpose and Public Policy*

Father, supported by several amici curiae, also argues that his interpretation of the statute is necessary to vindicate important policy interests that motivated the above-discussed changes to section 300. Echoing the reasoning in *Drake M.*, *supra*, 211 Cal.App.4th at page 765, he asserts that the definition of substance abuse that he proposes is necessary to ensure consistency across dependency findings and guarantee they are premised on sufficient showings of substance abuse, as opposed to mere substance use. Father describes the alternative approach, in which substance abuse is defined by reference to conventional understandings of the term, as "nothing more than 'you'll know it when you see it.' " These policy arguments do not persuade us to adopt Father's interpretation of the statute.

At the outset, it is unclear whether Father's proposed definition of substance abuse would avoid the problems he perceives with assigning this term its usual meaning. Recall again that Father regards the DSM-5-TR as the touchstone for the necessary analysis today, under the theory that the enacting Legislature intended for the meaning of substance abuse to evolve in step with developments in professional expertise. The DSM-5-TR regards a diagnosis of a stimulant use disorder as appropriate upon satisfaction of two or more out of 11 identified criteria. (DSM-5-TR, *supra*, at p. 632.) Some of these criteria are susceptible to expansive and potentially inconsistent application, particularly in the hands of untrained laypeople, e.g., "[t]he stimulant is often taken in larger amounts or over a

longer period than was intended"; "[t]here is a persistent desire or unsuccessful efforts to cut down or control stimulant use"; "[a] great deal of time is spent in activities necessary to obtain the stimulant, use the stimulant, or recover from its effects"; and "[c]raving, or a strong desire or urge to use the stimulant." (*Ibid.*) Connecting substance abuse under section 300(b)(1)(D) to the relevant DSM criteria is therefore not the obvious panacea that Father makes it out to be.[13]

Nor are the findings required for dependency jurisdiction under section 300(b)(1)(D) as elastic as Father asserts. Significantly, as previously alluded to, the recognition of substance abuse by a parent or guardian does not by itself establish that the other requirements for the exercise of dependency jurisdiction under section 300(b)(1)(D) have been satisfied. Even with sufficient proof of substance abuse, the government also bears the burden of proving by a preponderance of the evidence (see § 355, subd. (a)) that this abuse makes the parent or guardian unable to provide regular care for a child, and that this inability has caused a child to suffer serious physical harm or illness or places the child at substantial risk of serious physical harm or illness. (See, e.g.,

---

[13] Father asserts that premising findings of substance abuse on satisfaction of the relevant DSM criteria would comport with prevailing best practices among social workers. Whatever relevance these practices may have to the central question of legislative intent, we do not perceive a significant tension between standards calling for social workers to stay abreast of current knowledge regarding substance use disorders and how we conclude "substance abuse" should be interpreted as it appears in section 300(b)(1)(D). Such knowledge may be pertinent to an assessment of what amounts to excessive use of drugs or alcohol.

*In re Destiny S.* (2012) 210 Cal.App.4th 999, 1003 (*Destiny S.*) [jurisdiction under § 300 cannot be premised on drug use alone, without evidence of serious physical harm or illness or a substantial risk of such harm or illness].)

On this subject, although we reject the *Drake M.* court's interpretation of the term "substance abuse," we agree with its conclusion that the facts before the juvenile court in that case did not support the exercise of dependency jurisdiction due to parental substance abuse. The father in *Drake M.* used marijuana pursuant to a medical recommendation four or five times a week, mostly early in the day, to ease pain in his hands and knees. (*Drake M.*, *supra*, 211 Cal.App.4th at pp. 760–761.) He smoked the substance in a detached garage, away from his young child, and otherwise kept it in a locked box that the child could not access. (*Ibid.*) When the father smoked marijuana with his wife, another adult watched over their child. (*Id.* at pp. 758, 759.) The father stated that at least four hours would pass between when he smoked marijuana and when he saw his child after day care, and that by that time he no longer felt any problematic effects of the drug. (*Id.* at p. 761.) No evidence was offered before the juvenile court, in the form of expert testimony or otherwise, to establish that the father would still be feeling such effects upon resuming supervision of the child (*id.* at pp. 761, 767–768), and no other substantial issues were reported in connection with the child's care (*id.* at p. 758). Viewing the record as a whole, even though *Drake M.*'s reasoning was flawed with respect to how it defined substance abuse, we believe that its ultimate conclusion rejecting the exercise of dependency jurisdiction under what is today section 300(b)(1)(D) was nonetheless correct. (*Drake M.*, at p. 768.) The record before that court did not contain substantial evidence of substance

abuse that made the father unable to provide regular care for his child and placed the child at substantial risk of serious physical harm or illness.

Meanwhile, there are substantial countervailing policy considerations that counsel against regarding the DSM criteria for substance use disorders as providing the exclusive yardsticks for assessments of substance abuse for purposes of section 300(b)(1)(D). These include the fact that DSM criteria are designed for clinical application and assume the availability of information relevant to a diagnosis. Several of the DSM-5-TR criteria for substance use disorders, such as the presence of cravings, tolerance, and withdrawal symptoms (e.g., DSM-5-TR, *supra*, at pp. 632–633), rely on information that might commonly be divulged by a patient interested in obtaining an accurate diagnosis, but may not be as readily forthcoming from a parent or guardian during the dependency process. Courts therefore may lack the information necessary to apply the DSM criteria in their intended manner.

Also, Father's approach gives short shrift to the DSM's warnings that its criteria should not be mechanically applied by laypeople and may not capture all of the considerations relevant to a legal question that may come before a court. Cautionary statements regarding the DSM's use have appeared in versions of the manual dating back to the DSM-III.[14] The statement

---

[14] DSM-5-TR, *supra*, at page 29; DSM-5, *supra*, at page 25; DSM-IV-TR, *supra*, at page xxxvii; DSM-IV, *supra*, at page xxvii; DSM-III-R, *supra*, at page xxix. The statement in the DSM-III, which bore the title, "CAUTIONS," provided in full: "The purpose of DSM-III is to provide clear descriptions of diagnostic categories in order to enable clinicians and

within the DSM-III-R, for example, advised that the proper use of the manual's "criteria requires specialized clinical training that provides both a body of knowledge and clinical skills" and warned that the DSM-III-R's inclusion, "for clinical and research purposes, of a diagnostic category such as Pathological Gambling or Pedophilia does not imply that the condition meets legal or other nonmedical criteria for what constitutes mental disease, mental disorder, or mental disability." (DSM-III-R, *supra*, at p. xxix.) The statement within the DSM-5-TR acknowledges that, "Although the DSM-5 diagnostic criteria and text are primarily designed to assist clinicians in conducting clinical assessment, case formulation, and treatment planning, DSM-5 is also used as a reference for the courts and attorneys in assessing the legal consequences of mental disorders. As a result, it is important to note that the definition of mental disorder included in DSM-5 was developed to meet the needs of clinicians, public health professionals, and research investigators rather than the technical needs of the courts and legal professionals." (DSM-5-TR, *supra*, at p. 29.) Following additional warnings, the statement continues, "Use of DSM-5 to assess the presence of a mental disorder by nonclinical, nonmedical, or otherwise insufficiently trained individuals is not advised." (*Ibid*.) Elsewhere, the DSM-5-TR warns that it should "not be applied mechanically by individuals without clinical training" and that the text's diagnostic criteria "are not

---

investigators to diagnose, communicate about, study, and treat various mental disorders. The use of this manual for non-clinical purposes, such as determination of legal responsibility, competency or insanity, or justification for third-party payment, must be critically examined in each instance within the appropriate institutional context." (DSM-III, *supra*, at p. 12.)

meant to be used in a rigid cookbook fashion." (*Id*. at p. 23.) Yet Father's approach runs a high risk of exactly that type of application, even assuming the best efforts of judges and others involved in the juvenile dependency process to faithfully apply the manual.

Rote application of the DSM criteria would be particularly inappropriate within a statutory scheme for dependency proceedings that is intended "to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2, subd. (a).) As the Department observes in its answer brief, as a diagnostic resource the DSM is not designed to "assess risk to a third party, much less a child." To identify one example of the disconnects that exist between the DSM criteria and the statutory scheme for juvenile dependency proceedings, if a parent or guardian engages in frequent stimulant use "resulting in a failure to fulfill major role obligations at work, school, or home" (DSM-5-TR, *supra*, at p. 632) that relate to the care of a child, it is unclear why another of the remaining 10 criteria for a stimulant use disorder enumerated within the DSM-5-TR — with any of these criteria sufficing — would also have to be satisfied to recognize substance abuse under section 300(b)(1)(D). And although the DSM-5-TR recognizes that a positive diagnosis may be rendered in some situations in which fewer than the normal number of required criteria are satisfied (DSM-5-TR, at p. 23), that allowance merely serves to underscore that the standard criteria-based requirements for diagnosis under the DSM do not and should not supply the definition of substance abuse in this setting.

### 4. *Our Interpretation Harmonizes with Prior Case Law Construing Section 300*

Our interpretation of the substance abuse language within section 300(b)(1)(D) as concerned with the excessive use of drugs or alcohol aligns with the analysis in our previous decisions that have declined to read implicit limitations into other grounds for the exercise of dependency jurisdiction. In *In re Ethan C.* (2012) 54 Cal.4th 610 (*Ethan C.*), we concluded that the Legislature intended for the word " 'neglect,' " as used in section 300, subdivision (f) to carry its "commonly understood meaning" (*Ethan C.*, at p. 627), rather than describing only situations in which a parent or guardian acted with criminal negligence. (*Id.* at pp. 627–631.) Likewise, in *I.J.*, *supra*, 56 Cal.4th 766, we rejected the position that "scientific authority or empirical evidence" were required to establish a substantial risk of harm to a father's sons based on sustained allegations that the father had sexually abused one of his daughters. (*Id.* at p. 778; see *id.* at pp. 778–779.) We held instead that "the juvenile court is supposed to use its best judgment to determine whether or not the particular substantial risk exists." (*Id.* at p. 779.) Finally, in determining that the invocation of dependency jurisdiction under section 300, subdivision (b)(1)(A) due to the failure or inability of a parent or guardian to adequately supervise a child did not require a finding of parental culpability, our decision in *R.T.*, *supra*, 3 Cal.5th 622 noted, "Because the Legislature has made parental culpability (based on either willful or negligent conduct) a requirement in some, but not all, grounds for asserting dependency jurisdiction under section 300, we may conclude that the omission of a culpability requirement in the first clause of section 300(b)(1) 'was purposeful.' " (*R.T.*, at

p. 630.) Similarly here, in contrast with the definitions that have been provided for other terms within the statute, there is no persuasive indication on the face of section 300 or otherwise that the Legislature intended to deviate from the ordinary understanding of the term "substance abuse."

> 5. *Substance Abuse Under Section 300 Does Not Require a Medical Diagnosis in Lieu of a Showing That the DSM Criteria Have Been Satisfied*

Although Father's briefing concentrates on the DSM criteria, he also acknowledges *Drake M.*'s position that a professional medical diagnosis of current substance abuse may suffice in lieu of a showing that these criteria have been satisfied. (See *Drake M.*, *supra*, 211 Cal.App.4th at p. 766.) Considerations similar to those discussed above also foreclose this interpretation of section 300's substance abuse language.

Just as we assigned significance to the absence of any reference to the DSM in the statutory scheme, we believe that had the Legislature intended to require a medical diagnosis of substance abuse, it would have said so. (See *Khalid H.*, *supra*, 6 Cal.App.4th at p. 736.) The Legislature certainly knew how to draw such a connection. A different provision within the statutory scheme for dependency proceedings assigns special significance to testimony from professionals. Under section 355.1, subdivision (a), "Where the court finds, *based upon competent professional evidence*, that an injury, injuries, or detrimental condition sustained by a minor is of a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent, the guardian, or other person who has the care or custody of the minor, that finding shall be prima facie evidence that the minor

is a person described by subdivision (a), (b), or (d) of Section 300." (Italics added.)

Other flaws with Father's arguments regarding the DSM's applicability also carry over to the position that substance abuse requires a medical diagnosis. Among these shortcomings, there is no indication within the legislative history that legislators contemplated such a close connection between a medical diagnosis and judicial recognition of substance abuse. With good reason; information that could be critical to a diagnosis by a medical professional may not be available at the prejurisdictional stage of a dependency proceeding, particularly given the limited powers of the court at that early stage of the dependency process. (See *Laurie S.*, *supra*, 26 Cal.App.4th at p. 202 ["At the prejurisdictional stage, an allegation by the Department that a parent is mentally ill or the fact of mental illness alone does not justify a psychological examination of that parent"].) Also, the considerations that may inform a medical diagnosis of substance abuse may be misaligned with legislative intent, in that these diagnostic criteria may not capture the aspects of abuse most relevant to a determination of whether a parent's or guardian's issues with drugs or alcohol render that person unable to provide regular care for a child and place that child at substantial risk of serious physical harm or illness.

Consistent with the discussion above, we conclude that a professional medical diagnosis is not required, whether on its own or as an alternative to satisfaction of the relevant DSM criteria, in order to establish the existence of substance abuse under section 300(b)(1)(D).

6. *Due Process Considerations Do Not Justify Father's Interpretation of Section 300*

Finally, Father argues that unless his proposed definition of substance abuse is adopted, the term is so indefinite that it violates constitutional due process guarantees. (See U.S. Const., 5th & 14th Amends.; Cal. Const., art. I, § 7, subd. (a).)

"The vagueness doctrine bars enforcement of ' "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." ' " (*In re Sheena K.* (2007) 40 Cal.4th 875, 890.) Yet " ' "a statute is not void simply because there may be difficulty in determining whether some marginal or hypothetical act is covered by its language." ' " (*People v. Morgan* (2007) 42 Cal.4th 593, 606.) " '[F]ew words possess the precision of mathematical symbols, most statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions. Consequently, no more than a reasonable degree of certainty can be demanded. Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line.' " (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1117, quoting *Boyce Motor Lines v. United States* (1952) 342 U.S. 337, 340.)

Due process considerations do not compel us to adopt Father's interpretation of section 300(b)(1)(D) or else find the statute unconstitutional. Section 300(b)(1)(D) provides adequate notice regarding the conduct that will support a jurisdictional finding based on a parent's or guardian's

substance abuse. As we have explained, the statute does not premise dependency jurisdiction on substance abuse alone, but requires that substance abuse, as commonly understood, makes a parent or guardian unable to provide regular care for a child and results in either serious physical harm or illness or a substantial risk of such harm or illness to the child. (See, e.g., *Destiny S., supra*, 210 Cal.App.4th at p. 1003.) Even acknowledging the existence of borderline cases, this standard is sufficiently concrete and intelligible that it avoids due process concerns. (See *Williams v. Garcetti* (1993) 5 Cal.4th 561, 570 [rejecting a due process vagueness challenge to Pen. Code, § 272 because Welf. & Inst. Code "[§] 300 provides guidelines sufficiently specific to delineate the circumstances under which a child will qualify for dependent status and thus to define the parental duty of care and protection that would prevent the occurrence of those circumstances"]; *In re Mariah T.* (2008) 159 Cal.App.4th 428, 435–438 [rejecting the argument that the phrase " 'serious physical harm,' " as it appears in § 300, subd. (a), is unconstitutionally vague]; accord, *Johnson v. United States* (2015) 576 U.S. 591, 603–604 ["As a general matter, we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct"].)

### 7. *Conclusion*

For the reasons provided above, we hold that under section 300(b)(1)(D), "substance abuse" bears its ordinary meaning of excessive use of drugs or alcohol, and that substance abuse by a parent or guardian may be established without a professional medical diagnosis of current substance abuse or satisfaction of the pertinent DSM criteria. In so holding, we recognize that a professional diagnosis, or evidence bearing upon whether DSM

criteria have been met, may be helpful in evaluating the existence of substance abuse at the jurisdictional stage of dependency proceedings or at another step in this process. (See, e.g., *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1346 [concluding that the government failed to meet its burden of showing that returning children to their mother would create a substantial risk of detriment to their safety, protection, or physical or emotional well-being (see § 366.22, subd. (a)) for reasons including, but not limited to, the absence of a medical diagnosis of substance abuse or proof that the mother satisfied the DSM's description of substance abuse].) Our decision today is not intended to discourage the presentation or consideration of such evidence in appropriate circumstances.[15]

Our holding also recognizes the significance of a jurisdictional finding. Dependency adjudication "allows the juvenile court, within specified limits, to assert supervision over the endangered child's care" (*Ethan C.*, *supra*, 54 Cal.4th at p. 617), and is therefore a weighty determination with important consequences. Yet it is also true that a jurisdictional finding is "a first step, and the system includes many subsequent safeguards to ensure that parental rights and authority will be restricted only to the extent necessary for the child's safety and welfare." (*Ibid.*; see also *R.T.*, *supra*, 3 Cal.5th

---

[15] As a matter of course, the Legislature remains free to redefine the term "substance abuse" as it appears within section 300(b)(1)(D) if it finds Father's arguments, or the arguments raised by amici curiae who have filed briefs in support of Father, to be compelling.

at p. 637; *In re Zeth S.* (2003) 31 Cal.4th 396, 410–411.)[16] These safeguards apply to cases involving substance abuse, just as they extend to other dependency matters.

Furthermore, as we have emphasized, dependency jurisdiction under section 300(b)(1)(D) requires more than just the identification of substance abuse by a parent or guardian. A court must also find that the parent or guardian is unable to provide regular care for a child and that as a result, the child has suffered serious physical harm or illness or is at significant risk of suffering serious physical harm or illness. The second issue presented for review, which we turn to next, concerns the relationship between a finding of substance abuse and these additional requirements.

## C. The Tender Years Presumption Conflicts with Legislative Intent and Must Be Rejected

We reject the position that a "finding of substance abuse is prima facie evidence of the inability of a parent or guardian to provide regular care resulting in a substantial risk of physical harm" to a child of " 'tender years.' " (*Drake M.*, *supra*, 211 Cal.App.4th at p. 767.)[17] Section 300, subdivision (b)(1)

---

[16] These safeguards "include representation by counsel to assist parents at every stage of the proceedings [citation], notice of all hearings and rights [citations], clear and convincing evidence for removal from custody [citation], reunification services [citation], and review hearings at which services and progress are reviewed." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307–308.)

[17] The rule announced in *Drake M.* expanded upon a more generic discussion appearing in *In re Rocco M.* (1991) 1 Cal.App.4th 814, abrogated on another ground by *R.T.*, *supra*, 3 Cal.5th at p. 629. That earlier decision had observed, "Cases

recognizes that substance abuse may make a parent unable to provide regular care, which in turn may create a substantial risk of serious physical harm or illness. But the rule articulated in *Drake M.* improperly short-circuits this analysis insofar as it regards substance abuse by a parent or guardian as always amounting to sufficient, though not conclusive, evidence of an inability to provide regular care to a young child and a substantial risk of serious physical harm to that child.

As a threshold matter, the parties' briefing reflects some uncertainty regarding whether this judicially created principle amounts to an inference or a presumption. To repeat, the relevant language in *Drake M.* provides that a "finding of substance abuse is prima facie evidence of the inability of a parent or guardian to provide regular care resulting in a substantial risk of physical harm." (*Drake M.*, *supra*, 211 Cal.App.4th at p. 767.) "A statute providing that a fact or group

---

finding a substantial physical danger [under section 300, subdivision (b)] tend to fall into two factual patterns. One group involves an identified, specific hazard in the child's environment — typically an adult with a proven record of abusiveness. [Citations.] The second group involves children of such tender years that the absence of adequate supervision and care poses an inherent risk to their physical health and safety." (*In re Rocco M.*, at p. 824, italics omitted.) The *Drake M.* court explained that "in cases involving the second group [discussed in *In re Rocco M.*], the finding of substance abuse is prima facie evidence of the inability of a parent or guardian to provide regular care resulting in a substantial risk of physical harm." (*Drake M.*, *supra*, 211 Cal.App.4th at p. 767.) Although there is no strict age cut-off after which a child is regarded as being beyond "tender years," this presumption has generally been applied in cases involving children of ages six or younger at the time of a jurisdiction hearing. (See, e.g., *Christopher R.*, *supra*, 225 Cal.App.4th at p. 1219.)

of facts is prima facie evidence of another fact establishes a rebuttable presumption" (Evid. Code, § 602), which is a kind of "assumption of fact that the law requires to be made from another fact or group of facts found or otherwise established in the action" (*id.*, § 600, subd. (a)), subject to rebuttal. A "judicially created nonstatutory 'inference,' if it meets the test of a presumption, should be regarded as, and given the effect of, a presumption." (1 Witkin, Cal. Evid. (6th ed. 2023) Burden, § 107.) It follows from the above that, as articulated in *Drake M.*, the tender years rule amounts to a presumption.

To assess this presumption, we apply the standard approach to statutory interpretation and begin our review with the text of the statute. (See *Meza, supra*, 6 Cal.5th at p. 856.) Nothing within the statutory scheme suggests that the requirements for the exercise of dependency jurisdiction under section 300(b)(1)(D) can be collapsed through a tender years presumption. The statute does not provide that a "finding of substance abuse is prima facie evidence of the inability of a parent or guardian to provide regular care resulting in a substantial risk of physical harm" to a young child (*Drake M.*, *supra*, 211 Cal.App.4th at p. 767), or anything similar. Rather, the relevant statutory text makes it clear that the government must establish, as separate elements, that (1) substance abuse (2) makes a parent or guardian unable to provide regular care for a child and (3) this inability has caused the child to suffer serious physical harm or illness or creates a substantial risk of such harm or illness. Just as courts have routinely rejected the equation of mental illness with a significant risk of serious harm (see, e.g., *In re A.G.* (2013) 220 Cal.App.4th 675, 684; *In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1318), we find the

tender years presumption adopted by *Drake M.* objectionable because it oversimplifies the necessary analysis.

Significantly, at several other junctures within the dependency scheme the Legislature has expressly identified situations in which specific proof will constitute prima facie evidence of a particular fact. For example, as previously observed, section 355.1, subdivision (a) provides that certain "competent professional evidence" shall be regarded as "prima facie evidence that the minor is a person described by subdivision (a), (b), or (d) of Section 300." Several other examples of a particular fact being cast as prima facie evidence of another fact appear elsewhere within the statutory scheme. (§§ 355.1, subd. (d), 361, subd. (c)(1), 364, subd. (c), 366.21, subds. (e)(1), (f)(1)(B), 366.22, subd. (a)(1), 366.25, subd. (a)(1).) The Legislature's manifested ability to assign such significance to certain facts or evidence in proving another fact suggests that it did not intend for courts to presume a similar relationship when not expressly provided for within the statutory text. (See *R.T.*, *supra*, 3 Cal.5th at p. 630.)

The Department asserts that the tender years presumption is a commonsense rule based on the well-understood needs of young children and still allows courts to fully consider all evidence presented on the question of whether a parent's or guardian's substance abuse places a young child at substantial risk of serious physical harm or illness.

This argument fails to fully grapple with the fact that the fundamental problem with the tender years presumption is not that it robs courts of discretion; it is that the presumption threatens to oversimplify the analysis required under section 300(b)(1)(D). It is reasonable for courts to infer that very young

children require a substantial degree of close supervision. But it is inappropriate to regard a parent's or guardian's excessive use of alcohol or an addictive drug as always being sufficient, by itself, to show that the parent or guardian is unable to provide regular care for a young child and that the child is therefore at substantial risk of serious physical harm. Even granting that this presumption may be rebutted, it still distorts the necessary inquiry under section 300(b)(1)(D) by treating one established fact (a parent's or guardian's substance abuse) as always amounting to sufficient proof of other facts (an inability to provide regular care and a substantial risk of serious physical harm to a child of tender years) without any indication that the Legislature approved of such conflation. We conclude that to uphold the Legislature's intent, an inability to provide regular care and a substantial risk of serious physical harm or illness must be established on the facts of each case, without relying on a categorical rule providing that a "finding of substance abuse is prima facie evidence of the inability of a parent or guardian to provide regular care resulting in a substantial risk of physical harm" to a child of " 'tender years.' " (*Drake M.*, *supra*, 211 Cal.App.4th at p. 767.)

In this respect, the basic task before the juvenile court is similar regardless of the age of the child involved. Substance abuse, when shown to exist, should not be regarded as automatically amounting to prima facie evidence of the other facts required for dependency jurisdiction. Courts must undertake a further inquiry to ascertain whether the government has met its burden as to each of the elements involved, without shifting the burden to a parent or guardian to rebut a presumption created by a finding of substance abuse. (See, e.g., *In re David M.* (2005) 134 Cal.App.4th 822, 830,

abrogated on another ground by *R.T.*, *supra*, 3 Cal.5th at pp. 628–629 [even accepting the existence of substance abuse by a parent, the evidence before the juvenile court failed to show that this abuse led to a significant risk of serious physical harm].)  Courts may in appropriate circumstances discern an inability to provide regular care and a substantial risk of serious physical harm or illness from the evidence that has been introduced in a particular case, including evidence relating to substance abuse, and the reasonable inferences that can be drawn from this evidence.  (See, e.g., *In re L.W.* (2019) 32 Cal.App.5th 840, 848–850 [mother's two arrests for driving under the influence, one of which led to a reckless driving conviction, adequately established a substantial risk of serious physical harm to her 13-year-old daughter].)  In this respect, a child's youth and maturity level can bear upon the care that the child may require and whether a parent's or guardian's substance abuse places the child at substantial risk of serious physical harm.  Courts can properly take these facts regarding a child into account, together with all other relevant evidence, in deciding whether the government has met its burden at the jurisdictional stage.  But courts may *not* shortcut the inquiry envisioned by the Legislature by regarding substance abuse as constituting prima facie evidence of an inability to provide regular care to a young child and a substantial risk of serious physical harm to that child, and then look to the parent or guardian to rebut this presumption.

For the foregoing reasons, we reject the tender years presumption and disapprove the Court of Appeal decisions that have relied upon it, along with the Court of Appeal decisions that have regarded a professional medical diagnosis or

satisfaction of the relevant DSM criteria as necessary for a finding of substance abuse under section 300(b)(1)(D).[18]

### D. Remand to the Court of Appeal

Father argues that the evidence before the juvenile court did not support a jurisdictional finding based on his drug use. The Department argues that substantial evidence supported the juvenile court's finding. Rather than decide this question ourselves, the better course is to remand this case to allow the Court of Appeal to revisit its analysis in light of our decision.

---

[18] We disapprove the following decisions insofar as each regarded a medical diagnosis of substance abuse or satisfaction of the relevant DSM criteria as necessary to a finding of substance abuse, recognized the tender years presumption, or both: *In re L.C.*, *supra*, 38 Cal.App.5th 646; *In re Alexzander C.*, *supra*, 18 Cal.App.5th 438; *In re Kadence P.* (2015) 241 Cal.App.4th 1376; *In re Christopher R.*, *supra*, 225 Cal.App.4th 1210; and *In re Drake M.*, *supra*, 211 Cal.App.4th 754. We also disapprove *In re K.B.*, *supra*, 59 Cal.App.5th 593 insofar as its assertion that "[w]hen a child is of tender age, a parent's substance abuse *can be* prima facie evidence of a risk of serious physical harm or illness" (*id.* at p. 603, italics added) might be read as broadly relieving the government of its full burden under section 300(b)(1)(D).

## III.  DISPOSITION

We reverse the judgment of the Court of Appeal and remand the cause to that court for further proceedings consistent with this opinion.

**GUERRERO, C. J.**

**We Concur:**

**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  In re N.R.

---

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)** XX NP opn. filed 4/29/22 – 2d Dist., Div. 5
**Rehearing Granted**

---

**Opinion No.** S274943
**Date Filed:** December 14, 2023

---

**Court:** Superior
**County:** Los Angeles
**Judge:** Martha A. Matthews

---

**Counsel:**

Sean Angele Burleigh, under appointment by the Supreme Court, for Defendant and Appellant.

Duke Law School, Allison E. Korn; UCLA School of Law and Alicia Virani for W. David Ball, Barton Child Law and Policy Center, Paul Bennett, Leo Beletsky, Taleed El-Sabawi, Matthew I. Fraidin, Stephanie K. Glaberson, Cynthia Godsoe, Crystal Grant, Josh Gupta-Kagan, Julia Hernandez, Alex Kriet, Sarah Lorr, Laura Matthews-Jolly, Jennifer D. Oliva, Dorothy Roberts, Shanta Trivedi and Vivek Sankaran as Amici Curiae on behalf of Defendant and Appellant.

Proskauer Rose, Jonathan M. Weiss, Justin B. Cohen, Michelle K. Moriarty and Bradley M. Presant for Association for Multidisciplinary Education and Research in Substance Use and Addiction and California Society of Addiction Medicine as Amici Curiae on behalf of Defendant and Appellant.

Leslie A. Barry for Persons with Lived Experience in the Child Welfare System as Amici Curiae on behalf of Defendant and Appellant.

Martin Schwarz, Public Defender (Orange), and Brian Okamoto, Deputy Public Defender, for California Dependency Trial Counsel and California Appellate Defense Counsel as Amici Curiae on behalf of Defendant and Appellant.

Minouche Kandel; Elizabeth Gill, Faride Perez-Aucar; Brenda Star Adams and Jean Strout for American Civil Liberties Union Foundation of Southern California, the American Civil Liberties Union Foundation of Northern California, the National Center for Youth Law and Children's Rights, Inc. as Amici Curiae on behalf of Defendant and Appellant.

Kellen Russoniello for Drug Policy Alliance, Any Positive Change, Beyond Do No Harm Network, California Coalition for Women Prisoners, Children's Defense Fund-California, CLARE Matrix, Community Legal Services in East Palo Alto, Elephant Circle, Immigrant Legal Resource Center, JMACforFamilies, Law For Black Lives, Legal Action Center, Legal Momentum, Women's Legal Defense and Education Fund, Legal Services for Prisoners with Children, National Harm Reduction Coalition, National Health Law Program, A New Path (Parent for Addiction Treatment & Healing), Pregnancy Justice, San Francisco AIDS Foundation and Sidewalk Project as Amici Curiae on behalf of Defendant and Appellant.

The Hill Law Firm and Tasha Alyssa Hill for Professor Alan J. Dettlaff and Professors of Social Work and Social Workers as Amici Curiae on behalf of Defendant and Appellant.

Rodrigo A. Castro-Silva and Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Sarah Vesecky and David Michael Miller, Deputy County Counsel, for Plaintiff and Respondent.

Jennifer Hearing; David Chiu, City Attorney (San Francisco), Kimiko Burton and Elizabeth McDonald Muniz, Deputy City Attorneys, for California State Association of Counties as Amicus Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Sean Angele Burleigh
Attorney at Law
PO Box 1976
Cortaro, AZ 85652
(415) 692-4784

David Michael Miller
Deputy County Counsel
500 West Temple Street, Suite 648
Los Angeles, California 90012
(213) 808-8777